**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

North Carolina Alliance for Retired Americans, *et al.*,

Plaintiffs,

v.

North Carolina State Board of Elections, *et al.*,

Defendants.

**Case No. 1:26-cv-00965-WO-JGM**

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

## NATURE OF THE MATTER

On September 4, 2026, the same day North Carolina began mailing absentee ballots to voters, the North Carolina State Board of Elections ("the Board") changed the rules governing how those ballots would be counted. After a failed attempt at notice-and-comment rulemaking, the Board rushed new policies into place by a party-line vote after only 30 minutes of discussion and no public input. Two of these new policies violate the U.S. Constitution and federal law: the Sealing Requirement, Ex.1 at 14, and Signature Verification Requirement, *id.* at 3 (the "Challenged Provisions"). Together, they will invalidate thousands of qualified voters' ballots in the November election unless enjoined.

*First*, the Sealing Requirement requires counties to disqualify ballots that arrive with an unsealed *inner* application envelope. For years, those ballots were counted so long as the *outer* envelope arrived sealed. Whether a completed inner application envelope arrives sealed is immaterial to assessing a voter's eligibility, as the Board recognized just two years ago when it acknowledged that invalidating ballots "simply because those ballots failed to arrive inside of two sealed envelopes would … violate[] the materiality provision" of the Civil Rights Act. Ex.22 at 18. No state interest justifies discarding ballots unless *both* envelopes arrive sealed, especially with no chance to cure.

*Second*, the Signature Verification Requirement requires election officials to verify that the signature on the inner application envelope belongs to the voter. But the Board provided neither standards for counties to apply, nor instruction on whether a signature deemed unverified is curable. It also struck express bans on both signature *verification* and

*matching*. This state-sanctioned free-for-all will subject ballots to disparate scrutiny between and within counties—resulting in unequal treatment and arbitrary disenfranchisement. As the Board acknowledged just a few years ago, such a system invites "obvious equal protection and due process complaints." Ex.5 at 5.

Plaintiffs seek to preliminarily enjoin the Sealing Requirement under the Civil Rights Act's Materiality Provision, and both Challenged Provisions for violating the First and Fourteenth Amendment rights to equal protection, to vote, and to due process. Relief is necessary to ensure Plaintiffs, their members and constituents, and other eligible North Carolinians have their votes counted. The balance of equities favors "preserving the status quo" that governed absentee ballots before the Board's eleventh-hour actions. *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 590 n.1 (7th Cir. 2012). Indeed, "[t]he public interest … favors permitting as many qualified voters to vote as possible." *LWV of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (quotation omitted).

## STATEMENT OF FACTS

### I. The Challenged Provisions create new bases to invalidate absentee ballots.

North Carolina has offered no-excuse absentee voting for decades. *See* N.C.G.S. §163-226. A voter's absentee-ballot package includes the ballot, an inner application envelope, and an outer return envelope. *See id.* §163-229. The inner application envelope includes a space for the voter to certify their eligibility, a clear sleeve for photo identification or exception documentation, and a space for certification by two witnesses or a notary. *Id.* §163-229(b).

North Carolina law prohibits discarding absentee ballots for "deficiencies that can be cured with supplemental documentation or attestation provided by the voter." *Id.* §163-230.1(e1). Neglecting to sign the inner application envelope or include photo identification is a curable deficiency; the only statutorily non-curable deficiency is the failure to identify witnesses. *See id*. Through binding directives called "Numbered Memos," the Board has designated additional curable and non-curable deficiencies. Ex.1 at 3-5, 8-10, 13-14.

North Carolina law requires counties to promptly notify voters of curable deficiencies and allow them to submit cure paperwork until the fifth business day following Election Day. *Id.* at 6. The Board takes a harsher tack for non-curable deficiencies: absentee ballots are discarded entirely. *Id.* at 10-12, 14-15. Impacted voters can theoretically vote a replacement ballot or vote in person, but these options are often illusory. *See infra* pp.6-8.

The Sealing and Signature Verification Requirements create new non-curable deficiencies that invalidate ballots without serving any legitimate state interest.

**A. The Sealing Requirement**

The Board previously directed counties to accept absentee ballots if the outer return envelope arrived sealed, even if the inner application envelope was unsealed or the ballot was not placed within the completed inner application envelope (a "naked ballot"). Ex.2 at 3-4. The Sealing Requirement now mandates disqualification of these ballots, even if the outer return envelope is fully sealed. Ex.1 at 14.

This requirement will cause otherwise-qualified ballots to be discarded for innocuous mistakes, which are more likely to be made by the elderly, first-time voters,

minority voters, and non-native English speakers. Ex.17 ¶13 (“Cohen”); Ex.6 at 8 (“Mayer”). Similar restrictions in other states have resulted in the rejection of thousands of ballots. Mayer at 10. The requirement has no relation to verifying voter eligibility, protecting voter privacy, or ensuring election security. *Id.* at 14-15; Cohen ¶17.

The Sealing Requirement allows no opportunity for cure, even though cure *is* allowed when an inner application envelope appears to have been opened and resealed. Ex.1 at 12-13. The revised Numbered Memo does not explain why the latter is curable, but the former is not. This difference will result in disenfranchisement, as voters are more likely to *cure* a ballot than cast a *new* one. Mayer at 6.

**B. The Signature Verification Requirement**

Previously, the Board expressly prohibited counties from trying to “verif[y]” the voter’s signature on the inner application envelope, instead instructing that they “*shall accept* the voter’s signature … if it appears to be made by the voter[.]” Ex.2 at 2 (emphasis added). It also *barred* signature matching, *i.e.*, “compar[ing] … the voter’s signature on the envelope” to other signatures on file. *Id.* The Board maintained this policy because, among other things, “[v]erification of the voter’s identity is completed through the witness requirement,” *id.*, which requires two witnesses or a notary to certify any absentee ballot. N.C.G.S. §§163-231(a), 163-22(o1).

The revised Numbered Memo unravels these commonsense policies, affirmatively requiring county officials to verify that the signature on the application “is the name of the voter” by “compar[ing] the signature to the voter’s name on the application to confirm

whether [it] is the voter's signature." Ex.1 at 3, 8. An official may reject a signature if, in their view, "clear evidence" indicates that it "is [not] that of the voter." *Id.* at 3. The Board offers no standards for this inquiry, including on what "evidence" counties may consider. And, in the same stroke, the Board struck its restriction on signature *matching*—which some county board members have recently attempted. Ex.14 ¶¶20-21 ("Grimes"). Signature matching is notoriously fraught with error, even when conducted by trained examiners applying clear, uniform standards—which decidedly is not the case here. *See* Ex.7 ¶¶54-63 ("Mohammed"); Ex.8 ¶¶6-9 ("Palmer").

The Board also does not say whether a signature that cannot be verified can be cured. A *missing* signature is a "curable deficiency," Ex.1 at 3, and a signature that looks like "the name of a person other than the voter" is not, *id.* at 8. But the policy is silent on whether a signature that is neither the voter's name nor another person's name—like initials, nicknames, or a "mismatched" signature—is curable or non-curable.

## II. The Challenged Provisions will disenfranchise Plaintiffs, their members and constituents, and other eligible voters.

For many voters whose ballots are disqualified, the option to vote a replacement ballot is a chimera. The revised Numbered Memo directs counties to send replacement absentee ballots to voters whose ballots are invalidated through the Friday before Election Day, Ex.1 at 10-11, but most voters will not have time to return a replacement by the deadline—the close of polls on Election Day. Identifying a deficiency and reissuing a ballot can take two business days, *id.* at 5, 10, and USPS advises allowing one week to deliver

mail ballots.[1] Thus, receiving and returning a replacement ballot can take approximately two weeks.[2] But during the last general election, more than 60% of absentee ballots first arrived at county offices within two weeks of Election Day. Mayer at 2. Those voters would lack time to receive, complete, and return a replacement ballot.

In-person voting is not a workable alternative for thousands of North Carolinians, including students, elderly or disabled voters, rural voters, and out-of-state or overseas voters. Mayer at 12, 14. And voters whose ballots are rejected *after* polls close have no recourse at all. It is thus not surprising that in 2024, less than 38% of voters with rejected absentee ballots ultimately successfully voted. Mayer at 13.

Plaintiffs and their members in particular stand to be disenfranchised. They rely on absentee voting due to age, illness, disability, lack of access to transportation, childcare obligations, academic or professional schedules, and out-of-state travel. Ex.13 ¶9 ("Nelson"); Ex.12 ¶¶6-7 ("Afokpa"); Ex.9 ¶¶7, 13 ("McCoy"); Ex.10 ¶¶13, 15 ("Koneru"); Ex.11 ¶¶8, 12 ("Zimmer"). Many may struggle to comply with the Sealing Requirement due to age or language barriers. McCoy ¶10; Koneru ¶15. And others are disproportionately likely to have their signature rejected for reasons related to their race, age, illness, disability, or language ability. Koneru ¶15; McCoy ¶8; Mohammed ¶¶32-41; Palmer ¶¶6-8. Organizational Plaintiffs are separately harmed because the Challenged Provisions

---

[1] USPS, *Election Mail*, https://perma.cc/Q2F5-E9L8 (last visited Sep. 28, 2026).

[2] This turnaround estimate is conservative, as county boards could invalidate ballots that staff initially approved up to a week later. N.C.G.S. §163-230.1(f).

frustrate their missions and interfere with their core activities, forcing them to rewrite educational mailers, restructure phone-banking efforts, host information sessions, and draft new communications materials to ameliorate the Challenged Provisions' effects. McCoy ¶16; Koneru ¶¶17-21; Zimmer ¶14.

## QUESTIONS PRESENTED

I. Whether the Sealing Requirement violates the Materiality Provision of the Civil Rights Act of 1964, 52 U.S.C. §10101(a)(2)(B).

II. Whether the Challenged Provisions violate Equal Protection and Procedural Due Process, and unduly burden the right to vote under the First and Fourteenth Amendments.

III. Whether the remaining preliminary injunction factors favor relief for Plaintiffs.

## LEGAL STANDARD

A preliminary injunction should issue when movants show "(1) they are likely to succeed on the merits; (2) they will likely suffer irreparable harm absent an injunction; (3) the balance of hardships weighs in their favor; and (4) the injunction is in the public interest." *LWV of N.C.*, 769 F.3d at 236.

## ARGUMENT

### I. Plaintiffs are likely to succeed on the merits.

Plaintiffs are likely to succeed on their claims that the Sealing Requirement violates the Materiality Provision and both Challenged Provisions violate the U.S. Constitution.

### A. The Sealing Requirement violates the Materiality Provision.

The Civil Rights Act of 1964 prohibits arbitrarily disenfranchising voters for immaterial errors. Through the "Materiality Provision," Congress prohibited officials "acting under color of law" from

> deny[ing] the right of any individual to vote … because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

52 U.S.C. §10101(a)(2)(B). The Sealing Requirement violates this provision because it requires election officials, acting pursuant to state law,[3] to (1) deny the right to vote; (2) based on a voter's error or omission "on" a document within the provision's scope; (3) which "is not material in determining" the voter's eligibility.

*First*, the Sealing Requirement denies the right to vote to any voter whose ballot it disqualifies. The provision defines "vote" to mean "all action[s] necessary to make a vote effective," including "registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted." *Id.* §10101(a)(3)(A), (e). Now, if a voter forgets to seal their inner application envelope, counties must disqualify the ballot. This denies the voter's right to "hav[e] [their] ballot counted" under the provision's plain text. *La Unión del Pueblo Entero v. Abbott* ("*LUPE*"), 705 F.Supp.3d 725, 756 (W.D. Tex. 2023) (quoting 52 U.S.C. §10101(a)(2)(B), (a)(3)(A)), *rev'd on other grounds sub nom.*

---

[3] *See* N.C.G.S. §163-27(d) (Board's Executive Director is "chief State elections official"); *id.* §163-22(c) (Board may "advise the county boards of elections").

*United States v. Paxton*, 148 F.4th 335 (5th Cir. 2025); *In re Ga. Senate Bill 202*, 2023 WL 5334582, at *9 (N.D. Ga. Aug. 18, 2023). That affected voters *may* cast a new ballot (time and ability permitting) does not negate the violation. *See LUPE*, 705 F.Supp.3d at 760-61 (neither "cure procedures" nor "the availability of in-person voting" "absolve" or "negate" an initial violation). And, in practice, few such voters will have a meaningful opportunity to cast an effective vote. *See supra* pp.6-8.

*Second*, the inner application envelope is precisely the sort of document Congress intended the Materiality Provision, which governs "*any* record or paper relating to *any* application," to regulate. 52 U.S.C. §10101(a)(2)(B) (emphasis added). The envelope contains a printed "application" to vote absentee. *See* N.C.G.S. §§163-229(b) (defining contents of "[a]pplication on container-return envelope"), 163-230.1(a)(2) ("Simultaneous issuance of absentee ballots with *application*" (emphasis added)). The inner envelope *is*, and therefore must "relat[e] to," the application printed upon it. 52 U.S.C. §10101(a)(2)(B).

This conclusion holds notwithstanding out-of-circuit cases narrowly and incorrectly interpreting the Materiality Provision's reach. A few courts—and only one federal circuit—have interpreted the provision's reference to "*any* record or paper relating to *any* … act requisite to voting" to mean only those papers used in "voter qualification determinations," excluding certain paperwork errors on absentee ballots. *Pa. State Conf. of NAACP Branches v. Sec'y Pa.*, 97 F.4th 120, 126, 131 (3d Cir. 2024) (emphasis added); *but see In re Ga. Senate Bill 202*, 2023 WL 5334582, at *10 ("[C]ompleting the outer [mail ballot] envelope is an 'act requisite to voting' because without it, the vote will not count.").

Those decisions contravene the provision's plain language. But even under their narrow read, the provision applies here because absentee-ballot applications *are* part of the "process" to "determin[e] whether an individual is qualified to vote." *Pa. NAACP*, 97 F.4th at 131. These applications include "[t]he voter's certification of *eligibility to vote* the enclosed ballot," N.C.G.S. §163-229(b)(1) (emphasis added), including their registration status, residency, citizenship, age, and criminal history, *see* Ex.20. Counties cannot count an absentee ballot if the voter does not complete the application. N.C.G.S. §§163-230.1(e), 163-234. And falsely certifying eligibility on this application is a Class I felony. *Id.* §163-275(16). Courts have applied the Materiality Provision to absentee-ballot certifications in similar circumstances. *See LWV of Ark. v. Thurston*, 2021 WL 5312640, at *3 (W.D. Ark. Nov. 15, 2021).

*Third*, whether the inner application envelope is sealed within the outer return envelope is immaterial to determining the voter's qualifications. "The legal meaning of materiality typically sets a 'demanding' standard." *Get Loud Ark. v. Jester* ("*GLA*"), 171 F.4th 1058, 1065 (8th Cir. 2026) (quotation omitted). "An error is 'material' when it is 'important' or has 'influence or effect' over a decision maker." *Id.* (quoting *Material*, Black's Law Dictionary 1128 (4th ed. 1951)). The Sealing Requirement does not approach this standard. A voter confirms their eligibility by *signing* the application; whether they then seal the envelope has no bearing on their eligibility. *See* Cohen ¶13.[4]

[4] Whether the Sealing Requirement advances *another* state interest is irrelevant. *See GLA*, 171 F.4th at 1066 ("The [Materiality Provision's] text contains no interest-burden balance.

### B. The Challenged Provisions violate the Equal Protection Clause by subjecting absentee ballots to arbitrary, nonuniform disqualification.

Plaintiffs are also likely to succeed in showing both Challenged Provisions violate the Fourteenth Amendment, which prohibits using arbitrary and inconsistent standards to count votes. The Equal Protection Clause "prohibit[s] 'governmental decisionmakers from treating differently persons who are in all relevant respects alike.'" *Griffin v. N.C. State Bd. of Elections*, 781 F.Supp.3d 411, 429 (E.D.N.C. 2025) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). In the election context, that means "a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). This principle applies beyond "the initial allocation of the franchise." *Bush v. Gore*, 531 U.S. 98, 104 (2000) (per curiam). "Line-drawing is inconsistent with the Equal Protection Clause when a state, 'by later arbitrary and disparate treatment, value[s] one person's vote over that of another.'" *Griffin*, 781 F.Supp.3d at 429 (quoting *Bush*, 531 U.S. at 104-05).

Federal courts routinely enjoin laws or policies that "value one person's vote over that of another," *Bush*, 531 U.S. at 104-05, whether through standardless ballot-canvassing schemes that give voters in different counties different likelihoods of having their votes counted, or by applying different rules to similarly situated voters. The Signature Verification Requirement fails under the first basis, and the Sealing Requirement under the second.

---

To pass muster, a rule must actually be 'material in determining' whether applicants are qualified to vote."). Still, it does not. *See infra* pp.20-21.

**1. *The Signature Verification Requirement*** will subject voters to precisely the sort of inconsistent standards and arbitrary ballot-counting rules the Supreme Court squarely foreclosed in *Bush v. Gore*. There, the Court invalidated a ballot-counting regime that required election officials to determine whether "an indentation on a ballot was significant enough to evince a voter's intent to vote for a Presidential candidate," and "'each of the counties used varying standards' to assess ballots." *Griffin*, 781 F.Supp.3d at 430 (discussing *Bush*, 531 U.S. at 105-07). Such "arbitrary and disparate treatment [of] voters in [] different counties" violates the Equal Protection Clause. *Bush*, 531 U.S. at 107.

Courts have since held that a total absence of standards to guide officials' discretion when counting ballots violates equal protection. *See, e.g.*, *Ford v. Tenn. Senate*, 2006 WL 8435145, at *8 (W.D. Tenn. Feb. 1, 2006) (finding "grave equal protection concerns" where state "failed to adopt and articulate a consistent standard" for excluding votes "that me[t] the uniformity requirement of the Equal Protection Clause"); *LULAC of Iowa v. Pate*, 2019 WL 6358335, at *16 (Iowa Dist. Ct. Sep. 30, 2019) (where "no statutory guidance is provided as to how to determine whether a signature doesn't match," signature-matching provisions "allow[] for similarly situated individuals to be treated differently"). Courts have similarly invalidated ballot-canvassing schemes that arbitrarily produce different outcomes across counties. *See, e.g.*, *Gallagher v. N.Y. State Bd. of Elections*, 477 F.Supp.3d 19, 48-49 (S.D.N.Y. 2020) (finding likely equal protection violation where validity of votes cast "in precisely the same manner … depend[ed] entirely on the speed at which [voters'] local post office delivered their votes"); *Black v. McGuffage*, 209 F.Supp.2d 889, 899 (N.D.

Ill. 2002) (denying motion to dismiss equal protection claim where "people in different counties ha[d] significantly different probabilities of having their votes counted, solely because of the nature of the [voting equipment] used in their jurisdiction").

The Signature Verification Requirement introduces the standardless disenfranchisement that the Board previously—and intentionally—guarded against. The prior Numbered Memo expressly disavowed any "signature verification" requirement. Ex.2 at 2. The revised Numbered Memo replaces that directive with a *requirement* that "county boards must review the signature on the application to ensure that the signature on the application is the name of the voter assigned the application number." Ex.1 at 3. But it provides *no* guidance on how to examine signatures or otherwise implement the requirement. Nor has the Board issued further guidance since. *E.g.*, Grimes ¶22. For at least three reasons, this new policy grants counties *carte blanche* to review ballots under inconsistent and arbitrary standards.

*First*, "[t]he task of handwriting analysis by laypersons," like county board members, "is fraught with error." *Saucedo v. Gardner*, 335 F.Supp.3d 202, 217 (D.N.H. 2018); *see also* Mohammed ¶¶14-18, 29, 54-65. Board members from several counties describe the confusion already brewing across the state. Grimes ¶19; Ex.15 ¶24 ("Ericson"); Ex.16 ¶9 ("Swift"). In these circumstances, signature-verification standards will inevitably vary county to county—or even official to official, with arbitrary and uneven results sure to follow. Mohammed ¶¶23-25, 29-41; Palmer ¶¶11, 15; *see Frederick v. Lawson*, 481 F.Supp.3d 774, 796 (S.D. Ind. 2020) (signature verification creates "a real

risk of erroneous rejection [of ballots]," particularly without "safeguards built into the review procedures, such as functional standards, training, or significant oversight").

The only semblance of a standard in the revised Numbered Memo is the instruction to "presume that the voter's signature is that of the voter, even if the signature is illegible," unless there is "clear evidence to the contrary." Ex.1 at 3. But the Numbered Memo neither defines "clear evidence" nor identifies the "evidence" counties may consider. As a result, as one county board member explains, different reviewers will "make different judgments" on how to treat the same evidence, risking "arbitrary" invalidations. Ericson ¶20. The dearth of standards here contrasts sharply with the Board's detailed guidance on similar requirements, like verifying the name on a voter's photo ID against registration records. *Id.* ¶21; *see* Ex.3 at 7-10.

*Second*, compounding the issue, the Board struck its express prohibition on signature *matching*. *Compare* Ex.2 at 2 ("[A] voter's signature on the envelope shall not be compared with the voter's signature in their registration record."), *with* Ex.1 at 3. The Board offered no explanation for this curious change, despite previously finding that signature matching would raise "obvious equal protection" issues and "cannot be applied uniformly." Ex.5 at 5. Some reviewers will surely take this erasure as an invitation: In recent elections, some county board members have tried to invalidate ballots over perceived mismatches *despite the Memo's prior prohibition*. *See* Grimes ¶¶23-24. Voters subjected to signature matching will face far greater scrutiny than their neighbors in the next county over and—as courts have repeatedly recognized—a disproportionate risk of

arbitrary and erroneous disenfranchisement. *See, e.g.*, *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1316 (11th Cir. 2019) ("[A] signature-match scheme [that] calls on officials who are not required to receive formal training" is "nearly certain to incorrectly reject the ballots of some legitimate voters."); Mohammed ¶¶53-67.

*Third*, the Numbered Memo does not state whether a purportedly unverifiable signature is a curable or non-curable defect. *See* Ex.1 at 3; *supra* p.6. Voters' chances of having their vote count depend heavily on whether a deficiency is curable. Voters may *cure* an absentee ballot up to five business days after Election Day but must *recast* a non-curable ballot *by the close of polls* on Election Day. *See* Ex.1 at 6-7, 11-12. Both types of deficiencies create an intolerable risk of disenfranchisement, but voters forced to recast ballots are at the highest risk because whether they can cast an effective ballot depends on circumstances largely beyond their control, like mail speed. *See supra* pp.6-8. These factors explain the abysmally low percentage of voters who successfully cast replacement ballots in recent elections. *See* Mayer at 13.

Each of these features will inevitably subject North Carolinians to arbitrary and disparate treatment in violation of equal protection. *See, e.g.*, *Griffin*, 781 F.Supp.3d at 430-31; *LULAC of Iowa*, 2019 WL 6358335, at *16; *Frederick*, 481 F.Supp.3d at 799.

**2. *The Sealing Requirement*** likewise subjects voters to disparate treatment that violates equal protection. The Eastern District of North Carolina recently applied *Bush v. Gore* to conclude that "disparate treatment between similarly situated voters, based solely on their casting of ballots in 'different counties,' amounts to 'a constitutional violation' of

the Equal Protection Clause." *Griffin*, 781 F.Supp.3d at 430-31 (quoting *Bush*, 531 U.S. at 107) (invalidating non-uniform photo ID requirement that would have applied only to overseas voters from six counties); *see also NEOCH v. Husted*, 696 F.3d 580, 598 (6th Cir. 2012) (per curiam) (affirming preliminary injunction because consent decree "likely violate[d] equal protection" by permitting cure for voters who used last four digits of their SSN to cast a provisional ballot, but not other identification methods).

The Sealing Requirement compels counties to treat similarly situated voters differently—discarding the ballots of some, while allowing others to cure. Now, counties must allow voters to cure their ballot if the outer return envelope arrives sealed, but the inner application envelope appears to have been opened and resealed. Ex.1 at 13. Yet they must invalidate naked ballots and ballots in unsealed inner application envelopes, even if the outer envelope is sealed. *Id.* at 14. There is no reason for this differential treatment: If a voter can cure a resealed ballot with an "attestation provided by the voter," the same must be true for an unsealed ballot. *See* N.C.G.S. §163-230.1(e1). The Board has offered no reason to think otherwise. And the difference matters: the cure process offers voters an opportunity to have their ballot counted; ballot disqualification does not. *See supra* pp.6-8.

### C. The Challenged Provisions violate the constitutionally protected right to vote by subjecting voters to disparate treatment and undue burdens.

Plaintiffs are also likely to succeed in showing that the Challenged Provisions' disparate treatment of voters unduly burdens the right to vote under *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). Under this framework, courts must "weigh the character and magnitude of the asserted injury to the

[plaintiff's] rights" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," including "the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick*, 504 U.S. at 434 (quotation omitted). The more severe the burden on the right to vote, the more exacting the scrutiny. But "'however slight [a law's] burden may appear,' the court must be satisfied that the burden is 'justified by relevant and legitimate state interests sufficiently weighty to justify the limitation.'" *Fusaro v. Howard*, 19 F.4th 357, 368 (4th Cir. 2021) (citation omitted); *see also Eakin v. Adams Cnty. Bd. of Elections*, 149 F.4th 291, 312-14 (3d Cir. 2025) (explaining *Anderson-Burdick* review is always more searching than rational basis), *cert. granted*, Nos. 25-962, 25-967 (U.S. Feb. 13, 2026).

**1. The Challenged Provisions seriously burden the right to vote.**

For two mutually reinforcing reasons, the Challenged Provisions impose a serious burden on the right to vote that triggers *at least* heightened scrutiny.

*First*, the Challenged Provisions' disparate treatment of voters, *supra* pp.13-17, requires heightened scrutiny. The lowest level of *Anderson-Burdick* review—where "the State's important regulatory interests" generally suffice to justify a minimally burdensome law—is reserved for "*nondiscriminatory* restrictions." *Burdick*, 504 U.S. at 434 (emphasis added) (citation omitted). But when a law "facially discriminates between two classes of electors … the burden that law places on the right to vote is more than minimal." *Mays v. LaRose*, 951 F.3d 775, 786 (6th Cir. 2020). It does not matter whether the classification is otherwise constitutionally suspect. *Id.* (addressing an absentee-ballot request deadline that

distinguished between "hospital-confined [electors] and everyone else"). The Sealing Requirement arbitrarily and facially distinguishes between voters who submit an unsealed and resealed inner application envelope (who may cure), and voters who do not seal the inner application envelope or submit a naked ballot (who may not). And the Signature Verification Requirement will, through its lack of standards, result in counties scrutinizing absentee-ballot signatures differently. The resulting burden on voting rights is thus "more than minimal," increasing judicial review. *Id.*

*Second*, the Challenged Provisions will *disenfranchise* hundreds, if not thousands, of voters—imposing at least a serious burden on voting rights. Mayer at 16; *see Eakin*, 149 F.4th at 311 (assessing disenfranchising "consequences" to avoid "under-scrutiniz[ing] laws that … severely burden constitutional rights because of their downstream effects"); *Fish v. Schwab*, 957 F.3d 1105, 1128 (10th Cir. 2020) (law that prevented 31,089 Kansans from registering to vote imposed a "significant" burden). Over the last two election cycles, nearly *16,000* ballots with unsealed inner envelopes were rejected in just three other states with similar sealing requirements. Mayer at 10. Such deficiencies are "common" in North Carolina. Cohen ¶13. And many more voters are at risk because an official, applying arbitrary standards, may refuse to verify their signatures—including for reasons as innocuous as signing with initials instead of their full name. Mayer at 15; *see also* Swift ¶10; Ericson ¶20; *Lee*, 915 F.3d at 1316. For many voters, a non-curable absentee ballot will mean disenfranchisement. *See supra* pp.6-8; *Pérez-Guzmán v. Gracia*, 346 F.3d 229, 241 (1st Cir. 2003) (noting the burden on the right to vote need not be "insuperable" to be

severe); *see also Lee*, 915 F.3d at 1321 (inadequate cure procedures "impose[d] at least a serious burden on the right to vote").

The Challenged Provisions will also disproportionately burden certain voters, including inexperienced voters, Nelson ¶¶11-13; older voters, McCoy ¶¶6-11, 14-15; and racial minorities, *see* Koneru ¶¶13, 15; *see also* Palmer ¶¶6-10; Mayer at 8, 11. Such disparate impacts also elevate the level of scrutiny. *See Hussey v. City of Portland*, 64 F.3d 1260, 1265-66 (9th Cir. 1995) (finding law "severe[ly]" burdened voting rights by "disproportionately affect[ing] the poor"); *LWV of Fla., Inc. v. Detzner*, 314 F.Supp.3d 1205, 1216 (N.D. Fla. 2018) ("Disparate impact matters under *Anderson-Burdick.*").

**2. No state interest supports the Challenged Provisions.**

Because no legitimate state interest justifies the serious burden either provision imposes, they fail *any* level of *Anderson-Burdick* scrutiny, let alone heightened scrutiny. County board members attest that the Challenged Provisions will *create*—not alleviate—financial and administrative burdens on election officials. *Compare* Ericson ¶¶17, 23; Grimes ¶¶27-29, *with* Exs.18,19 (Board adopting Challenged Provisions with no discussion of state interests).

***Sealing Requirement.*** The state has no interest in requiring disqualification. *See* Mayer at 14-15 (Sealing Requirement contributes to neither "election security" nor "voter privacy"). Any chain-of-custody interest that might be served is satisfied by the voter sealing the *outer* return envelope. Cohen ¶15; Ericson ¶16. Indeed, most other states with similar sealing requirements do not disenfranchise voters for such deficiencies. Mayer at

15; *Green Party of Ga. v. Kemp*, 171 F.Supp.3d 1340, 1369 (N.D. Ga. 2016) (finding that "ballot access restrictions [that were] among some of the most stringent compared to other states'" undermined the state's regulatory interest). But even if the Sealing Requirement advanced some state interest, it would still be served by allowing voters cure—an opportunity the Board extends to similarly situated voters. *Supra* p.17; *see* N.C.G.S. §163-230.1(e1) (providing that voters may cure ballots that "can be cured with supplemental documentation or [voter] attestation"); Ex.4 at 6 (Board noting in declaratory ruling that sealing issues may be "cur[able] by the voter"); Grimes ¶17.

***Signature Verification Requirement.*** No state interest justifies this requirement, either. The Board was previously unequivocal that "[v]erification of the voter's identity is completed through the witness requirement," Ex.2 at 2, and the revised Numbered Memo does not say otherwise. North Carolina also requires absentee voters to submit their photo identification or exception form with their absentee ballot. N.C.G.S. §§163-230.1(f1), 163-166.16(d); *see also* Grimes ¶18; Mayer at 15 ("[S]ignature verification…offers no protection against invalid votes."). *No other state* that requires a witness or notary for absentee voting conducts signature verification. Ex.21 at 41; *see Green Party of Ga.*, 171 F.Supp.3d at 1369. The requirement is unnecessary and, at any rate, does not reliably verify voters' identities. *Supra* pp.5-6, 13-16.

**D. The Challenged Provisions violate Due Process.**

Finally, Plaintiffs are likely to show that the Challenged Provisions deprive North Carolina voters of procedural due process. A procedural-due process-claim requires

showing "(1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) that the procedures employed were constitutionally inadequate." *Accident, Inj. & Rehab., PC v. Azar*, 943 F.3d 195, 203 (4th Cir. 2019).

Plaintiffs easily make all three showings. First, "[t]he right to vote is a constitutionally protected liberty interest." *Democracy N.C. v. N.C. State Bd. of Elections*, 476 F.Supp.3d 158, 227 (M.D.N.C. 2020). Because North Carolina guarantees all voters the right to vote by absentee ballot, this liberty interest includes "the counting of [individuals'] votes when submitted through absentee voting." *Id*. Second, the Challenged Provisions are state action that will deprive many electors of their right to vote. *Supra* pp.19-20. And third, the Challenged Provisions fail to provide "fair notice of impending state action and an opportunity to be heard," the two cornerstones of constitutionally adequate process. *Snider Int'l Corp. v. Town of Forest Heights*, 739 F.3d 140, 146 (4th Cir. 2014) (citing *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). That "[v]oters are simply never notified or afforded any opportunity to respond if election officials reject their ballots … all but ends the inquiry." *Self Advoc. Sols. N.D. v. Jaeger*, 464 F.Supp.3d 1039, 1052 (D.N.D. 2020); *see also Democracy N.C.*, 476 F.Supp.3d at 227 ("[C]omplete lack of statewide curing procedure [wa]s constitutionally inadequate.").

Neither *post*-deprivation notice nor the option to cast a replacement ballot *if* time permits rehabilitates the Challenged Provisions' affront to due process. The adequacy of such processes turns on "(1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of that interest given the procedures used, as well as the

probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest." *Accident, Inj. & Rehab., PC*, 943 F.3d at 203. Each of these factors favors Plaintiffs. The interest at stake—the right to vote—is weighty. *See Democracy N.C.*, 476 F.Supp.3d at 228 (citing cases); *see also Burdick*, 504 U.S. at 433. The risk of erroneous deprivation is significant, where a voter's ability to cast a replacement ballot depends on many factors outside their control, including when officials identify the deficiency, mail turnaround times, and structural impediments to in-person voting. *See supra* pp.6-8. And as explained, no legitimate government interest supports either Challenged Provision, *supra* pp.20-21, let alone one that "outweigh[s] the value of the additional notice and cure procedures that protect the fundamental right to vote." *Self Advoc. Sols. N.D.*, 464 F.Supp.3d at 1053. Instead, the Challenged Provisions will *impose* new burdens on election officials. *See supra* p.20. Requiring pre-deprivation notice and cure processes already available for materially indistinguishable envelope and signature-related deficiencies, Ex.1 at 3, 13; Ericson ¶18, "would involve minimal administrative burdens while still furthering" any interest the state might advance. *Martin v. Kemp*, 341 F.Supp.3d 1326, 1339-40 (N.D. Ga. 2018). Thus, Plaintiffs are likely to succeed on their due-process claims, as well.[5]

[5] Some courts have applied *Anderson-Burdick* to procedural due process claims in voting-rights cases. *See, e.g.*, *Voto Latino v. Hirsch*, 712 F.Supp.3d 637, 666 (M.D.N.C. 2024). For the reasons discussed in Argument §II.C, the Challenged Provisions fail that test as well.

## II. The remaining factors support preliminary relief.

The remaining preliminary injunction factors favor granting relief. *First*, absent preliminary relief, Plaintiffs will suffer irreparable harm.[6] Because of the Challenged Provisions, Plaintiff Nelson and many of the Organizational Plaintiffs' members and constituents face a serious risk that their absentee ballots will be invalidated, potentially disenfranchising them altogether. *Supra* pp.6-7. *See, e.g.*, *Jones v. Governor of Fla.*, 950 F.3d 795, 828 (11th Cir. 2020) ("The denial of the opportunity to cast a vote that a person may otherwise be entitled to cast—even once—is an irreparable harm."); *LWV of N.C.*, 769 F.3d at 247 (finding irreparable injury on the basis that "once the election occurs, there can be no do-over and no redress").

The Challenged Provisions also irreparably harm the Organizational Plaintiffs' missions and core activities. Plaintiffs must now redirect their limited resources to ameliorate the harms they threaten. *See* McCoy ¶16; Koneru ¶¶17-22; Zimmer ¶¶14-15. These efforts constitute a necessary "diversion of resources away from" the Organizational Plaintiffs' other essential activities to further their "core missions," exacting "significant and irreparable" harm. *HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021); *see also LWV of U.S. v. U.S. Citizenship & Immigr. Servs.*, 2026 WL 2224637, at *31 (D. Md. Aug. 3, 2026) ("A harm is considered irreparable to a mission-driven organization where an

[6] For the same reasons Plaintiffs will be irreparably harmed, they have suffered and will suffer injuries sufficient for Article III standing. *See, e.g.*, *Missouri v. Biden*, 738 F.Supp.3d 1113, 1153 (E.D. Mo. 2024). The requested relief would redress the harm Plaintiffs face because of the Challenged Provisions. *See supra* pp.7-8.

action or policy 'unquestionably make[s] it more difficult for the [organization] to accomplish [its] primary mission.'" (alterations in original) (quoting *LWV of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016))).

*Second*, the balance of hardships favors an injunction. Voter Plaintiffs, Organizational Plaintiffs' members and constituents, and other North Carolina voters face irreparable loss of their right to vote, and Organizational Plaintiffs face mission impairment and resource diversion in the crucial weeks before the November election. Defendants will not be harmed because the Challenged Provisions serve no legitimate state interest, *see supra* pp.20-21; instead, they burden election administrators during an already busy and ongoing election, *see, e.g.*, Grimes ¶¶27-29; Cohen ¶18. Moreover, an injunction would support North Carolina's interest in an orderly election because it would "preserve the status quo." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 n.8 (4th Cir. 2019). The public interest strongly favors "upholding constitutional rights," *Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003), and "permitting as many qualified voters to vote as possible," *LWV of N.C.*, 769 F.3d at 247 (citation omitted). The Board cannot immunize itself by waiting until the eve of the election to burden voting rights. "[L]ate-blooming problems are not necessarily immune to correction because of *Purcell*." *N.C. State Conf. of the NAACP v. McCrory*, 214 F.Supp.3d 466, 472 (M.D.N.C. 2016) (citing *Obama for Am.*, 697 F.3d 423).

## CONCLUSION

The Court should preliminarily enjoin the Challenged Provisions.

Dated: September 28, 2026

Respectfully submitted,

/s/ *Narendra K. Ghosh*
Narendra K. Ghosh
N.C. Bar No. 37649
**PATTERSON HARKAVY LLP**
100 Europa Drive, Suite 420
Chapel Hill, NC 27517
Telephone: (919) 942-5200
nghosh@pathlaw.com

Lalitha D. Madduri*
Aria C. Branch*
Harleen K. Gambhir*
Desiree Pelletier*
**ELIAS LAW GROUP LLP**
250 Massachusetts Avenue, N.W., Suite 400
Washington, D.C. 20001
Telephone: (202) 948-1135
lmadduri@elias.law
abranch@elias.law
hgambhir@elias.law
dpelletier@elias.law

Walker McKusick*
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
Telephone: (202) 948-1135
wmckusick@elias.law

** Notice of Special Appearance Forthcoming*

*Counsel for Plaintiffs*

## CERTIFICATE OF WORD COUNT

I hereby certify that this Brief complies with Local Rule 7.3(d)(1) in that it does not exceed 6,250 words in length, including the body of the brief, headings, and footnotes.

This the 28th day of September, 2026.

/s/ *Narendra K. Ghosh*

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system, emailed this day to the agents/officers of the Defendants, and will be sent by FedEx on September 29, 2026, to the agents/officers of the Defendants, addressed as follows:

Tim Hoegemeyer
General Counsel
North Carolina State Board of Elections
430 N. Salisbury St., Suite 3128
Raleigh, NC 27603
tim.hoegemeyer@ncsbe.gov

Derek L. Bowens
Director
Durham County Board of Elections
3825 S. Roxboro Street, Suite 101
Durham, NC 27713
dbowens@dconc.gov

Charlie Collicutt
Director
Guilford County Board of Elections
301 W. Market St.
Greensboro, NC 27401
guilfordelections@guilfordcountync.gov

This the 28th day of September, 2026.

/s/ *Narendra K. Ghosh*