**UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| NORTH CAROLINA ALLIANCE FOR RETIRED AMERICANS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>NORTH CAROLINA STATE BOARD OF ELECTIONS, *et al.*,<br><br>Defendants. | **Case No. 1:26-cv-00965-WO-JGM** |

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Defendants North Carolina State Board of Elections and its Members in their official capacities (the "NCSBE"), submit this memorandum opposing Plaintiffs' Motion for Preliminary Injunction (the "Motion").

## INTRODUCTION

Equity favors the vigilant. Plaintiffs here were far from vigilant. Plaintiffs claim this is an emergency, but if so, it is an emergency of their own creation. Despite admitting that similar rules were adopted this summer [D.E.1 ¶¶60-62], Plaintiffs claim surprise that the Revised Numbered Memo 2021-03 was issued on September 4, 2026 [D.E.1-1] (the "Numbered Memo"). Then, Plaintiffs waited weeks to challenge the Numbered Memo and nearly another week to seek emergency injunctive relief, filing the night before County Boards of Elections held their first required meeting to review returned absentee ballots. Make no mistake, County Boards are actively reviewing absentee ballots using the

Numbered Memo's guidance—it is the status quo. *Purcell* forbids disrupting the status quo during an ongoing election, and the Court can deny Plaintiffs' preliminary injunction on this basis alone.

Plaintiffs are also unlikely to succeed on the merits. Plaintiffs' Complaint, much like the chimera invoked in their briefing, is based on a series of myths, seeking relief that is impossible to achieve. Plaintiffs' complaints about the Sealing and Signature Requirements (the "Challenged Provisions") boil down to this: the Numbered Memo complies with the law, namely N.C.G.S.§§163-230.1(d) and -231(a)(3), which Plaintiffs admit, requires the container-return envelope be signed and sealed. [D.E.1 ¶47]. Tellingly, Plaintiffs do not challenge the underlying statutes. Plaintiffs' final complaint about the Signature Requirement is based on the illusory premise that signature verification is equivalent to "signature matching"—a completely unfounded myth easily unraveled by the NCSBE's own written guidance. Plaintiffs' Motion should be denied.

## FACTUAL BACKGROUND & PROCEDURAL HISTORY

North Carolina's election laws "are among the more expansive in the nation." *Democracy N. Carolina v. De Luca*, No. 1:23-CV-878, 2026 WL 836812, at *36 (M.D.N.C. Mar. 26, 2026). North Carolina polls are open on election day for 13 hours, at approximately 2,600 locations statewide. *Id.;* N.C.G.S.§163-166.25(a). North Carolina also offers up to 17 early voting days, including a Saturday, where voters can use any polling place in their county. *Id.;* N.C.G.S.§§163-166.35(d). Finally, North Carolina offers no-excuse absentee ballots, available 60 days prior to election day. *Id.;* N.C.G.S.§§163-226(a), 163-227.10(a). When looking at methods of voting, the majority of North

Carolinians choose to vote in-person either on election day or via in-person early voting. [Ex.1 pp.5-6].[1] The NCSBE is tasked with administering North Carolina's expansive election system. [Ex.2 ¶4].[2]

As Plaintiffs admit, the NCSBE has "significant authority" to publish election guidance provided it does not conflict with North Carolina's election statutes. [D.E.1 ¶54]. This guidance often comes through directives known as numbered memos, which are formal guidance issued pursuant to the NCSBE's statutorily delegated authority. [Ex.2 ¶6]. These numbered memos are updated as the NCSBE improves upon practices and implements changes to state and federal law. [*Id.*]. Over the last several years numbered memos have provided guidance to County Boards on how to comply with legal or statutory changes to Voter ID, same-day registration, and other election laws.[3] [*Id.*]. Importantly, numbered memos can be issued or revised at any time, including during an election. [*Id.*].

Plaintiffs challenge two tiny provisions of the Numbered Memo, governing a small piece of North Carolina's voting system—absentee ballots. Under North Carolina's absentee ballot system, there is a container-return envelope with an application on one side of the envelope for a witness to certify their eligibility and the witnesses or notary, as well as any assistants, to complete a certification, and a clear sleeve for the voter's photo identification on the other side. N.C.G.S.§163-29. This "Application on Container-Return Envelope" (hereinafter the "Application") is not a new voter registration application, and

---

[1] **Exhibit 1** is the Expert Report of Dr. Michael Barber.
[2] **Exhibit 2** is the Declaration of Adam Steele, Deputy General Counsel for NCSBE.
[3] Some of the previous materials Plaintiffs cite in their Complaint pre-date statutory changes to North Carolina's election code.

the language that must be included on the container-return envelope is enumerated in N.C.G.S.§163-29(b). [Ex.2 ¶13]. Additionally, statute requires that voters sign the Application and seal their ballot in the container-return envelope. N.C.G.S.§§163-230.1(d) and -231(a).[4] The container-return envelope is then placed in another envelope to respect voter privacy (the "Outer Envelope"). [*Id.*]. Plaintiffs do not challenge this statutory requirement. Instead, they only challenge portions of the Numbered Memo.

Under the Numbered Memo, County Boards are required, within one business day of receipt of the absentee ballot,[5] to determine if there is a deficiency or irregularity with the container-return envelope, Application, or photo ID. The Numbered Memo defines a curable deficiency, in part, as "an issue with the container-return envelope" that can be cured with supplemental documentation or an attestation from the absentee voter. [D.E.1-1 p.2]. In the "Curable Deficiencies" section, County Boards are instructed to check if the voter signed as required. [*Id.* at p.3]. If there is a signature, the County Boards are instructed to review and ensure it is the name of the voter assigned the absentee ballot "and not some other person." [*Id.*]. County Boards are instructed to "presume" that the signature is "the voter's signature" absent "clear evidence" to the contrary. [*Id.*]. Importantly, the Numbered Memo makes clear there is no deficiency if a voter signed (even illegibly), provided there is no clear contrary evidence. [*Id.*]. Thus, concerns about poor handwriting or shortened name forms (e.g. D.E.5-14¶13; D.E.5-15¶19; D.E.5-16¶20; D.E.5-17¶10) are not

[4] The requirement to sign and seal the envelope is printed on the ballot and the container-return envelope. [*See e.g.* Ex.1 p.15; Ex.2 ¶13].

[5] The previous iteration did not require the review be conducted within one business day.

deficiencies. If a County Board identifies a curable deficiency, the Numbered Memo provides for a cure process, which must be initiated within one business day. [D.E.1-1, pp.5-8].

The Numbered Memo also identifies "non-curable" deficiencies. In relevant part, a non-curable deficiency is one where the absentee ballot is inside the container-return envelope, which is not sealed, or appears to have been opened and re-sealed, and was not received in the Outer Envelope, or if it was received in the Outer Envelope which was likewise unsealed or opened and re-sealed. [D.E.1-1, p.8]. However, if an unsealed ballot is returned in person, it is not a deficiency for the voter to seal the container-return envelope in the presence of staff.[6] [*Id.*]. It is likewise non-curable if the signature on the inner envelope is "the name of a person other than the voter," unless it is the name of an assistant's signature on the Application. [*Id.* at 8-9]. Despite calling them "non-curable" the Numbered Memo still provides the voter with ample due process via notification of the deficiency and other voting options (the "PDP Notification").

Pursuant to N.C.G.S.§163-230.1(f), County Boards must hold public meetings each Tuesday, beginning the fifth Tuesday before the election "for the purpose of action on applications for absentee ballots." Those meetings began on September 29, 2026. [Ex.2 ¶¶18-19]. If staff identify a non-curable deficiency, the County Board proceeds with the notification process outlined in Numbered Memo Section 3.2. [D.E.1-1 p.10]. If the

[6] It is an irregularity for the inner envelope to be unsealed, regardless of whether it is in a sealed Outer Envelope [D.E.1-1, p.12-13]. This is likewise governed by the notification process in Section 3.2 of the Numbered Memo. [*Id.*].

deficiency is identified on or before the Friday before election day, staff must, within one business day, mail the voter: (1) a new absentee ballot package; and (2) a notice detailing the deficiency, the spoil and reissue process, and the voter's in-person voting options. [*Id.* at 10-12]. The voter is also notified by phone or email. [*Id.*]. If the non-curable deficiency is identified on the Friday before election day, this process must occur the next day (Saturday). [*Id.*]. If the non-curable deficiency is identified on or after the Saturday before election day, the notification must occur same day. [*Id.*].

In addition to the PDP notification, the NCSBE maintains a system called BallotTrax where an absentee voter can track the status of their ballot and receive a series of proactive alerts on ballot status. [Ex.2 ¶15].

The Numbered Memo was posted on the State Board's website and transmitted to the County Boards on September 4, 2026, by NCSBE Deputy General Counsel, Adam Steele. Included in the email was an explanation of the signature review process, which Mr. Steele explicitly stated was "not matching a signature against another signature—only making sure the name signed is the voter's name." [Ex.2 ¶8].

Plaintiffs filed their Complaint on September 22, 2026, and filed their Motion after business hours on September 28, 2026. Plaintiffs' Motion was accompanied by 22 exhibits, totaling approximately 575 pages, including three expert reports.

**QUESTION PRESENTED**

1. Are Plaintiffs entitled to the extraordinary remedy of a preliminary injunction?

## ARGUMENT

To obtain preliminary injunctive relief, Plaintiffs must demonstrate: (1) substantial likelihood of success on the merits; (2) likelihood of irreparable harm; (3) that the balance of equities favors the movant; and (4) issuance of the injunction serves the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[7] Failure on any element precludes injunctive relief. *Henderson ex rel. Nat'l Lab. Rels. Bd. v. Bluefield Hosp. Co.*, 902 F.3d 432, 439 (4th Cir. 2018). Preliminary relief "is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. This warning is especially salient when, as here, Plaintiffs seek a mandatory injunction, altering the status quo before final judgment. *Pierce v. N. Carolina State Bd. of Elections*, 97 F.4th 194, 209 (4th Cir. 2024). Because "[t]he rationale behind a grant of a preliminary injunction has been explained as preserving the status quo," *Hazardous Waste Treatment Council v. South Carolina*, 945 F.2d 781, 788 (4th Cir. 1991), "[m]andatory preliminary injunctive relief"—i.e., relief that "goes well beyond simply maintaining the status quo *pendente lite*"—"in any circumstance is disfavored." *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994).

Plaintiffs seek to enjoin the Challenged Provisions in the Numbered Memo. This would not only disrupt the status quo during an election they concede is already underway (D.E.5-15¶5; D.E.5-16¶5; D.E.5-18¶5), but would also, in effect, enjoin unchallenged statutes. This request is presumptively "disfavored" and is justified only by "the most

---

[7] When the government is the opposing party, the third and fourth factors "merge." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022).

extraordinary circumstances." *Id*. Those "extraordinary circumstances" are absent. *Pierce*, 97 F.4th at 210.

## I. The Equities Do Not Favor a Mandatory Injunction.

A preliminary injunction is unwarranted for the independent and threshold reason that the equities do not support one. *Winter*, 555 U.S. at 25-26. To evaluate the equities, the Court "look[s] to the practical realities and necessities inescapably involved in reconciling competing interests." *Lemon v. Kurtzman*, 411 U.S. 192, 201 (1973). When balancing these realities, the Court considers that "equity ministers to the vigilant, not to those who sleep upon their rights." *Pierce v. N. Carolina State Bd. of Elections*, 713 F.Supp.3d 195, 241 (E.D.N.C. 2024), *aff'd*, 97 F.4th 194 (4th Cir. 2024) (citing *Perry v. Judd*, 471 Fed. App'x 219, 224 (4th Cir. 2012)). The equities are also governed by *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam), which dictates "that federal district courts ordinarily should not enjoin state election laws in the period close to an election," and that appellate courts should stay injunctions if lower federal courts contravene that principle. *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Mem.) (Kavanaugh, J., concurring).

*First*, Plaintiffs' own delay strongly cuts against them. Plaintiffs waited eighteen days to file suit and another six days (less than 24 hours before meetings on absentee ballots began) to seek an injunction.[8] Plaintiffs' delay "belie[s] [their] claim that there is an urgent need for speedy action to protect [their] rights." *John Lemmon Films, Inc. v. Atl. Releasing Corp*., 617 F.Supp. 992, 996 (W.D.N.C. 1985).

[8] Plaintiffs admit they were tracking this issue during the summer of 2026. [D.E.1¶¶60-62].

*Second*, weighing the harm favors Defendants. It is well-established that enjoining a state from enforcing their election laws inflicts "a form of irreparable injury." *Pierce,* 97 F.4th at 225 (citing *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). Plaintiffs' briefing fails to address this. Instead, Plaintiffs complain that they may lose the opportunity to vote. [D.E.6, p.25]. But as discussed *infra* pages 12-13, this is speculative and based on distortion of the Numbered Memo. Nor would an order granting the Motion enjoin the statutory requirement that the ballot be sealed in the container-return envelope and Application signed by the voter. N.C.G.S.§163-230.1(d) and -231(a). Next, Organizational Plaintiffs argue that they are harmed by needing to issue new guidance. [D.E.6, p.25]. But guidance is issued in every election, and this requirement is superfluous since the NCSBE also issues guidance of its own. [Ex.2 ¶6]. Moreover, Plaintiffs already developed materials responding to the Numbered Memo. [D.E.5-10¶16; 5-11¶18; 5-12¶14], so altering them again would require more resources, and create voter confusion. Plaintiffs argue there is no harm to Defendants because an injunction "would 'preserve the status quo'" [D.E.6, p.25]. This is false. In election cases, state actions "establish the status quo." *Pierce,* 713 F.Supp.3d at 214 (citing *Wise v. Circosta*, 978 F.3d 93, 98 (4th Cir. 2020)). Therefore, the Numbered Memo issued on September 4, 2026 is the status quo.

Finally, *Purcell* independently warrants denial of Plaintiffs' Motion. As Plaintiffs admit, the election is currently underway. [D.E.5-15¶5; D.E.5-16¶5]. Absentee ballot mailing began on September 4, 2026. [Ex.2 ¶12]. As of the morning of October 8, 2026, approximately 123,828 ballots have been issued, of which, approximately 25,612 are already cast. [*Id.*¶15]. County Boards began holding meetings to consider absentee ballots

on September 29, 2026. [*Id.*¶19]. The absentee ballot request deadline is October 20, 2026. [*Id.*¶12]. In-person early voting begins on October 15 and ends October 31, 2026. [*Id.*¶20]. Election Day is November 3, 2026. [*Id.* Ex.D]. In addition to these dates, the NCSBE and County Boards must meet a plethora of other deadlines. [*Id.*¶20].

This should give the Court pause, as the Supreme Court has "repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Abbott v. League of United Latin Am. Citizens*, 146 S. Ct. 418, 419 (2025) (citation omitted); *Pierce*, 97 F.4th at 226-27 (ongoing elections and the changes an injunction would necessitate would "result in the voter confusion and disruptive consequences the *Purcell* principle is designed to avoid"). With the electoral machine already moving, an injunction cannot, as a matter of equity, issue. *Milligan*, 142 S. Ct. at 879 (Kavanaugh, J., concurring). This Court should deny Plaintiffs' invitation to circumvent well-settled precedent, all of which advise against the relief sought.

## II. Plaintiffs Are Unlikely to Succeed on the Merits or Show Irreparable Harm.

Plaintiffs must "clearly establish[] entitlement to the relief sought" on the merits, including subject matter jurisdiction, and more than a mere possibility of irreparable harm. *Di Biase v. SPX Corp.*, 872 F.3d 224, 230, 232 (4th Cir. 2017). Plaintiffs cannot meet these threshold burdens.

### A. Plaintiffs Lack Standing.

Separate from the merits of their claims and a determination on standing for final relief, Plaintiffs must establish that they are likely to establish subject matter jurisdiction.

*Id.; Coll. Democrats of N. Carolina v. N. Carolina State Bd. of Elections,* No. 1:26-CV-92-WO-JLW, 2026 WL 327927, at *2, n.2 (M.D.N.C. Feb. 8, 2026).

Article III requires "(i) that [plaintiffs] suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) ("*Alliance*"). Organizations must show the same elements, including harm to their core mission. *Id.* at 395-96. Plaintiffs do not carry that burden. Their alleged injuries depend on the speculative chain of possibilities Article III forbids. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). Even if injuries exist, they are not traceable to the Numbered Memo, nor are they redressable.

**1. Plaintiffs Suffer No Injury in Fact.**

An injury in fact must be concrete, particularized, and imminent—not abstract, or dependent on a highly attenuated chain of possibilities. *Id.* Neither individual Plaintiff satisfies this standard. Afokpa and Nelson allege that they fear future signature review and envelope issues, but neither alleges they will submit a noncompliant ballot, their ballots were rejected, or that in-person voting or cure procedures will be unavailable. [D.E.1¶¶18-19]. Organizational Plaintiffs fare no better: their diversion-of-resources theory fails under *Alliance*, 602 U.S. at 394-95, and no organizational Plaintiff identifies a member who has suffered concrete harm. *N. Carolina All. for Retired Americans v. Hirsch*, 741 F.Supp.3d 318, 330-32 (E.D.N.C. 2024) (dismissing a similar challenge by the N.C. Alliance for lack of standing). At most, organizational members express a preference for absentee voting, but preference is not harm.

### 2. Plaintiffs' Alleged Injuries Are Not Fairly Traceable to Defendants or Redressable by the Requested Injunction.

Causation requires a close nexus between the alleged injury and defendant's conduct. *Disability Rights S.C. v. McMaster*, 24 F.4th 893, 901 (4th Cir. 2022). Plaintiffs cannot satisfy causation by "rely[ing] on speculation about the unfettered choices made by independent actors not before the courts." *Alliance*, 602 U.S. at 383-84. Redressability requires showing that it is "likely, as opposed to merely speculative," that favorable relief will redress the injury. *Hirsch*, 741 F.Supp.3d at 328

Traceability fails at the first link. Plaintiffs seek relief based on a chain of alleged future ballot rejections not directly caused by the Numbered Memo. Even assuming the Numbered Memo supplies the framework Plaintiffs challenge, which it does not, their theory still depends on independent contingencies: voter failure to comply with the printed instructions provided to each absentee voter, Ex.2 ¶13, county review, timing, and the voter's inability or unwillingness to use PDP notification options. *Alliance* rejects standing theories that depend on speculation about third-party choices. 602 U.S. at 383-84. More fundamentally, Plaintiffs' sealing theory runs afoul of the unchallenged statutes, N.C.G.S.§163-230.1(d) and -231(a), which require the voter to seal their ballot in the container-return envelope and sign the Application. Any injury from the Challenged Provisions, speculative as it may be, is not caused by the Numbered Memo.

Plaintiffs' claims are also not redressable. In addition to not challenging the underlying statutes, Plaintiffs' expert also admits that, in 2024, ballots were rejected because "the signature on the absentee ballots was not the name of the voter." [D.E.5-7

p.15]. Thus, an injunction here fails to address the statutory requirement or the previous practices allowing the very thing Plaintiffs complain of here.

### B. Plaintiffs Cannot Establish Irreparable Harm.

As discussed *supra*, Plaintiffs' alleged injuries are premised upon conjecture, untethered from the plain text of the rules they challenge. All Plaintiffs can muster is a possibility of harm, conditioned on a series of speculative events concerning a host of independent actors not before the Court. The irreparable harm prong requires likelihood, not mere possibility. *Winter*, 555 U.S. at 21-22.

Plaintiffs' experts do little to salvage the Motion's shortcomings. Despite concluding with "certainty" that the rules will harm "hundreds of thousands" of voters, Dr. Mayer admits that his central forecast is probabilistic and his analysis lacks the reliable data necessary to reach the broad conclusions he touts. [D.E.5-7, p.15-16]. It also misreads the law.[9] Mayer's conclusions are further undermined by his failure to disaggregate voters whose ballots were rejected under prior regimes or rules. [Ex.1 pp.29-31]. In fact, because Mayer's analysis focus on ballots, not voters, voters are double counted, leading to inflated numbers and unreliable conclusions. [*Id.*]. In a similar vein, Mayer then isolates single datapoints and uses them to make unfounded—and easily disproven—conclusory leaps. [*Id.* pp.28-30]. Even Mayer's analyses of other states are cherry-picked to create a

---

[9] Mayer suggests that the Numbered Memo leaves officials to make standardless signature determinations. [D.E.5-7, p.15-16]. But North Carolina does not engage in signature matching for absentee ballots. [D.E.5-2 p.4; Ex.2 ¶8].

misleading picture, and fail to connect a meaningful throughline to the relevant statutory scheme used in North Carolina. [*Id.* pp.26-28].

Similarly, Plaintiffs' other experts—Drs. Mohammed and Palmer—fail to move the needle. Mohammed's analysis is unhelpful based on the plain text of the Numbered Memo and clear directives to County Boards that prohibit signature matching. [*Id.* pp.15-16; Ex.2 ¶8]. Likewise, Palmer studies materially different states with inapposite statutory regimes. [Ex.1 pp.17-23]. Not only are Palmer's attempted racial estimates[10] completely unhelpful, but they are riddled with error because the states Palmer cites do not even collect racial data on voters. [*Id.* pp.19-21]. As a result, neither report offers any insight into absentee voting in North Carolina. [*Id.* pp.3-4].

When focusing on North Carolina's absentee ballot system, the record defies Plaintiffs' revisionism: the State's robust voting options and multifaceted absentee system lead to very low rejection rates, oftentimes on par or less than its peers. [*Id.* pp.5-15]. This is hardly the indicator of the oppressive regime Plaintiffs concoct.

### C. Plaintiffs Will Not Succeed on the Merits.

Even if Plaintiffs could establish standing, which they cannot, the Motion should still be denied because they cannot show a likelihood of success on the merits. *Winter*, 555 U.S. at 20.

[10] Plaintiffs' expert reports reference racial data and undefined "young voters." However, Plaintiffs do not bring any racial or age claims.

### 1. The Materiality Provision Does Not Federalize North Carolina's Physical Ballot-Casting Requirements.

As a threshold matter, Plaintiffs do not challenge North Carolina's statutory command that an absentee voter place the ballot in the container-return envelope and securely seal it. N.C.G.S.§§163-230.1(d), 163-231(a)(3); [D.E.1¶¶70;73–75]. The Challenged Provisions simply comply with the law, without adding any new voter obligations. [D.E.5-2, p.9,13]. That prior guidance treated some sealing errors differently, does not make NCSBE's improved practice unlawful. [D.E.5-5, pp.7–8,11–12]. Pleading deficiencies aside, Plaintiffs cannot show a likelihood of success because the Materiality Provision does not apply to the Numbered Memo's sealing directives.[11]

At bottom, the Materiality Provision addresses errors or omissions on records or papers used to determine voter qualifications. *United States v. Paxton*, 148 F.4th 335, 340 (5th Cir. 2025).[12] It does not federalize every physical step a voter must take to cast a ballot. *Pa. State Conf. of NAACP Branches v. Sec'y Commonwealth of Pa.*, 97 F.4th 120, 131-32 (3d Cir. 2024) ("*Pa. NAACP*"). Plaintiffs emphasize that the statutory definition of "vote" includes having a ballot counted. [D.E.6, p.9]. But a requirement unrelated to determining voter qualifications (like sealing the envelope) falls outside the Materiality Provision. 52

---

[11] There is a circuit split on whether the Materiality Provision includes a private right of action. *Compare Schwier v. Cox*, 340 F.3d 1284, 1294-97 (11th Cir. 2003) *and Vote.Org v. Callanen*, 89 F.4th 459, 478 (5th Cir. 2023) *with McKay v. Thompson*, 226 F.3d 752, 756 (6th Cir. 2000). The Fourth Circuit has not resolved the issue. NCSBE contends there is no private right of action.

[12] Plaintiffs wrongly claim that only the Third Circuit has reached this conclusion. [D.E.6, p.10]. That is incorrect. The Fifth Circuit in *Pax*ton agreed that the Materiality Provision applies only to "voter qualification determinations—not mail-in balloting." 148 F.4th at 340-41. Both Circuits that have directly confronted this question have rejected Plaintiffs' theories.

U.S.C. §10101(a)(2)(B), (a)(3)(A). Thus, Plaintiffs' theory that any defect affecting an envelope bearing an application necessarily falls within the Materiality Provision fails. [D.E.6, pp.8-11].

The alleged defect challenged here is not missing or inaccurate application information. It is the voter's failure to place the voted ballot in the container-return envelope and seal it. [D.E.1¶¶128–130]. That distinction marks the boundary between paperwork used to assess whether an individual is qualified to vote and neutral rules governing how a qualified voter casts a ballot.[13] *Pa. NAACP*, 97 F.4th at 131–32. Printing the Application (as defined by N.C.G.S.§163-229(b)) on the container-return envelope does not collapse every handling requirement into a generic application error. Plaintiffs' own authorities confirm the point. Each involved information supplied on election paperwork, not the physical packaging of a voted ballot. *League of Women Voters of Ark. v. Thurston*, No. 5:20-CV-05174, 2021 WL 5312640, at *3 (W.D. Ark. Nov. 15, 2021)[14]; *In re Ga. Senate Bill 202*, No. 1:21-CV-01259-JPB, 2023 WL 5334582, at *10 (N.D. Ga. Aug. 18, 2023); *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308–09 (N.D. Ga. 2018). Those cases do not establish that a voter may disregard a statutory ballot-return command simply because the required envelope also carries the Application.

[13] Failing to seal does not impact qualifications. Should a voter fail to seal, they are informed of the deficiency and given voting options, including the submission of a new absentee ballot if there is sufficient time. [D.E.5-2, p.11-12].

[14] Plaintiffs' claim that this case presents "similar circumstances" to this challenge is unfounded. *LWV of Ark.* was on a Rule 12 motion, and there were no likelihood-of-success findings, openly doubting the plaintiffs could obtain injunctive relief, even forecasting likely denial. 2021 WL 5312640, at *5.

Plaintiffs' contrary reading has no limiting principle tied to voter qualifications. Taken seriously, it could extend the Materiality Provision to ordinary rules involving ballot markings or envelope secrecy whenever those rules bear a tenuous connection to election paperwork.[15] *Pa. NAACP*, 97 F.4th at 134-35. Congress did not convert every ballot-casting instruction into a federal materiality question. Plaintiffs' Materiality Provision claim is unlikely to succeed.

### 2. Neither Challenged Provision Violates Equal Protection.

Equal protection prohibits arbitrary and disparate treatment of similarly situated voters. It does not invalidate a uniform statewide procedure based on speculation that local officials might later misapply it. *Lecky v. Virginia State Bd. of Elections*, 285 F.Supp.3d 908, 920 (E.D. Va. 2018) (citing *Bush v. Gore*, 531 U.S. 98, 105-06 (2000)). Plaintiffs cannot establish the required disparate treatment as to either of the Challenged Provisions.

#### i. *Signature Confirmation.*

Plaintiffs' signature theory begins by attacking requirements the Numbered Memo does not create. They mischaracterize the Numbered Memo as authorizing signature matching, then invoke cases and expert opinions directed at systems that compare handwriting against signatures on file. [D.E.6, p.5–6,13–16; D.E.5-2 p.4,9]. Plaintiffs'

[15] *Wasserberg* reinforces that distinction. Statutes require sealing, and the prior approach created chain-of-custody uncertainty when a ballot arrived outside the sealed container-return envelope. [D.E.5-5, p.7–8; D.E.5-2, p.9,13]. The *Wasserberg* consent judgment required NCSBE to reconsider the challenged declaratory-ruling request. *Wasserberg v. N.C. State Bd. of Elections*, 5:24-cv-00578, at D.E.65 (E.D.N.C. Dec. 4, 2025). The NCSBE did so and revised the guidance. [D.E.5-5, p.3,11–12; D.E.5-2, p.1]. It did not adopt Plaintiffs' position.

manufactured ambiguity cannot support the extraordinary relief they seek. *Richmond Med. Ctr. for Women v. Gilmore*, 144 F.3d 326, 331 (4th Cir. 1998).

The Numbered Memo's safeguards differentiate between confirming the voter is the one who signed the Application versus matching that signature to others in a database. It requires a strong presumption that the signature is the voter's, even if illegible, unless clear evidence shows otherwise. [D.E.5-2, pp.4,9]. Plaintiffs emphasize the removal of the prior Numbered Memo's express "no matching" language. But, deleting that sentence did not authorize the regime Plaintiffs concoct, *compare* [D.E.5-3, p.2], *with* [D.E.5-2, p.4,9], or overrule the July 2022 Declaratory Ruling [D.E.1-4]. But, most importantly, their reading was specifically disclaimed in guidance transmitted with the Numbered Memo itself. [Ex.2 ¶8]. Silence is not authorization, particularly when NCSBE directives point the opposite direction. Put simply—Plaintiffs' signature-matching theory is a red herring. [16]

The Numbered Memo differs in both text and operation. It asks whether the voter line bears the voter's name, while instructing officials to count even an illegible signature. That presumption matters. The Numbered Memo treats an illegible signature as valid but classifies a signature clearly by another person, like a witness, as a deficiency. [D.E.5-2, p.4,9]. The distinction tracks state law, which requires the voter's application and separate witness certification. N.C.G.S.§§163-229(b), 163-231(a), 163-231(a)(5). Confirming that

[16] For example, Plaintiffs' expert Palmer analyzes Washington and Colorado, both of which conduct universal vote-by-mail and have statutory signature-verification and cure regimes. [D.E.5-9, p.5-6,14-15]. That evidence is of limited help in assessing North Carolina.

the voter signed the Application is not "signature matching," it simply confirms that the statutory requirement is followed.

Nor have Plaintiffs shown the Numbered Memo has produced disparate implementation. Their declarations speculate that standards will vary, and their expert identifies a small number of alleged signature-related rejections under earlier practices. [D.E.5-15 ¶¶19–20; D.E.5-16 ¶20; D.E.5-17 ¶¶9–15]. But neither source identifies a post-revision county policy authorizing matching, a county-specific standard inconsistent with the Numbered Memo, or a ballot rejected under such a standard. Prediction is not implementation. That separates this case from *Bush*. There, the record showed different standards being used among counties and recount teams. 531 U.S. at 105-07. Here, the statewide presumption of validity and clear-evidence threshold provide the limiting standards *Bush* found absent. *Id.* at 106. Plaintiffs cannot turn the possibility of future error into proof that NCSBE has established an unconstitutional system.

**ii. *Sealing Requirement.***

Plaintiffs' sealing theory likewise treats different circumstances as the same. They are not. A voter may attest whether their container-return envelope that appears opened and resealed was, in fact, sealed when the voter relinquished it. [D.E.5-2, p.14–15]. That attestation resolves the ambiguity created by the envelope's appearance and confirms whether the voter performed the required act before the ballot entered the return process. The same is not true when a ballot arrives outside the container-return envelope or inside an envelope never sealed. An attestation cannot retroactively place a naked ballot in the required envelope or establish that an unsealed ballot remained protected from view or

alteration after leaving the voter's possession. [D.E.5-2, p.9,13,15]. Those defects implicate statutory compliance and chain of custody in a way apparent resealing does not. North Carolina law permits cure only for deficiencies correctable through supplemental documentation or voter attestation. N.C.G.S.§163-230.1(e1). It does not require the NCSBE to deem every physical ballot-return failure curable merely because some envelope irregularities can be resolved through attestation. Because the two groups committed different defects and present different evidentiary questions, they are not similarly situated. Equal protection does not require they be treated identically. *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).

### 3. Plaintiffs Cannot Establish an Undue Burden on the Right to Vote.

Plaintiffs' undue-burden claim is governed by *Anderson-Burdick*. The Court must weigh the character and magnitude of the asserted injury against the State's interests and the extent to which those interests justify the challenged rule. *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Severe burdens receive exacting scrutiny, while reasonable, nondiscriminatory rules stand when supported by important regulatory interests. *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 716–17 (4th Cir. 2016); *Buscemi v. Bell*, 964 F.3d 252, 265 (4th Cir. 2020). The analysis considers North Carolina's election system as a whole, rather than isolating one absentee-ballot instruction from surrounding voting methods and safeguards. *Pisano v. Strach*, 743 F.3d 927, 933 (4th Cir. 2014).

### i. *No Severe Burden on the Right to Vote*.

Measured in that context, the challenged provisions do not impose a severe burden. They apply statewide, require prompt review by trained staff, presume signed Applications valid, accept illegible signatures, and if necessary, provide notice, cure, and spoil-and-reissue procedures tailored to the nature and timing of the defect. [D.E.5-2, p.1,3–4, 6,11–15]. These are safeguards against disenfranchisement, not features of a system designed to produce it. *Anderson-Burdick* does not presume a constitutional violation whenever a voter who fails to comply with a neutral ballot-return rule must take an additional step. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 204-05 (2008) (Scalia, J., concurring); *Burdick*, 504 U.S. at 433–34. Nor do the provisions prohibit any identified class from voting. In assessing whether to apply strict scrutiny, courts distinguish absolute denial of the franchise from rules that make a preferred voting method more convenient for some voters. *Greidinger v. Davis*, 988 F.2d 1344, 1349–50 (4th Cir. 1993); *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807–08 (1969).

Plaintiffs' numerical forecast does not change the result. Mayer extrapolates from other states and candidly describes the projected North Carolina total as "probabilistic." [D.E.5-7, p.10,16]. His statistical conclusions are the products of a combination of both over-inclusivity and systemic overcounting, coupled with a blatant failure to disaggregate affected voters. [Ex.1 pp.29-31]. These analyses select incomplete and misleading datapoints to further conclusions that defy reality. [*Id.* pp.8-9, 23-29]. Similarly, Palmer uses inapposite states and an error-ridden predictive model to reach conclusions the record does not support. [*Id.* pp.19-23]. These forecasts do not establish any actual burden, let

alone a severe one. The procedures Plaintiffs minimize also matter. The Numbered Memo sets forth numerous ways for a voter to cure their ballot, or cast another. *Supra* pp.4-5. These procedures undercut the assumption that every affected voter is disenfranchised or unconstitutionally burdened simply because some may decline available alternatives.

**ii. *Any Burden is Modest and Justified by Important State Interests.***

Because any burden is modest, the Court weighs it against the State's justifications. That balance favors the NCSBE. The Numbered Memo closes no voting channel and restricts no voter's eligibility to vote absentee. Instead, it supplies uniform statewide standards together with notice, cure, and reissuance procedures. [D.E.1-1, p.1,3,6,11–15].

The State's interests in efficient election administration, election integrity, and orderly rules applied uniformly statewide are concrete and well recognized. *Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 595-98 (4th Cir. 2016); *Pisano*, 743 F.3d at 934-37. The sealing directive enforces a statutory requirement and addresses chain-of-custody concerns, including uncertainty about whether a ballot remained sealed after leaving the voter. N.C.G.S.§§163-230.1(d), 163-231(a)(3). [D.E.5-5, p.7–8]. The signature directive helps confirm that the voter, rather than some other person, signed the Application. [D.E.1-1, p.4,9]. That witness and photo-identification requirements may serve related interests does not render these separate safeguards illegitimate.

Plaintiffs' argument ultimately faults the NCSBE for declining their preferred procedures. *Anderson-Burdick* does not require the State to choose the least burdensome alternative or replicate another State's absentee-ballot rules. *Luft v. Evers*, 963 F.3d 665,

675 (7th Cir. 2020); *Crawford*, 553 U.S. at 190–91. The NCSBE chose procedures designed to preserve statutory safeguards and provide voters corrective options. [D.E.1-1, pp.1,3,6,11-15]. Plaintiffs' disagreement with that judgment does not make it unconstitutional.

North Carolina provides all eligible voters multiple ways to vote, including early voting with weekend hours. *Supra* pp.2-3. Plaintiffs' submissions show at most individualized circumstances that may make absentee voting preferable for some. Preference, however understandable, is not constitutional unavailability. Nothing in this record shows that the challenged provisions close the franchise or impose a statewide severe burden. *Rosario v. Rockefeller,* 410 U.S. 752, 757-58 (1973); *McDonald*, 394 U.S. at 807-08.

**4. There is No Procedural Due Process Violation.**

Plaintiffs' due process claim fares no better. Procedural due process is flexible and requires procedures suited to the circumstances. *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976). Plaintiffs describe the Numbered Memo as providing no meaningful process, but the Numbered Memo requires review within, at most, one business day, documenting deficiencies, providing written notice (with additional telephone or email notice), cure for eligible defects, spoil, and reissue when time permits, and same-day contact for later non-curable defects. [D.E.1-1, pp.3,6,11–15].

Plaintiffs identify no evidence that County Boards will ignore those procedures. Their objection is that the available remedy may not always produce their preferred result. They contend sealing defects should be cured by attestation instead of spoil and reissue.

[D.E.6, pp.22-23]. But due process does not guarantee a preferred procedure. It requires a constitutionally adequate one. *Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 610 (1974); *Tri Cnty. Paving, Inc. v. Ashe Cnty.*, 281 F.3d 430, 436 (4th Cir. 2002).

The Numbered Memo's defect-specific procedures satisfy that standard because they respond to the source of the problem. *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). An envelope that appears opened and resealed is explainable because the voter can attest to its condition prior to relinquishment. *Supra* pp.19-20. The signature rules are similarly tailored: a missing signature is curable, an illegible signature is valid, and only clear evidence that another person signed overcomes the presumption that the signature is the voter's. [D.E.1-1, pp.4,9]. That approach reduces the risk of erroneous deprivation while preserving the State's ability to administer absentee voting uniformly and securely. It also illustrates the limits of Plaintiffs' one-size-fits-all attestation proposal. An attestation can clarify an ambiguity; it cannot retroactively satisfy a physical ballot-return requirement or eliminate chain-of-custody concerns already arisen.

The *Mathews* balance therefore favors the NCSBE. 424 U.S. at 335. Any residual risk of error is mitigated by the presumption favoring validity and notice and reissuance procedures. On the other side are the NCSBE's interests in uniform and manageable absentee-ballot administration and the potential burden of imposing a different process during an ongoing election. [D.E.1-1 pp.1,3,6,11–13]. Due process does not require the Court to discard that calibrated system in favor of Plaintiffs' preferred remedy. Their claim is unlikely to succeed.

## CONCLUSION

For the foregoing reasons, Court should deny Plaintiffs' Motion for Preliminary Injunction.

Respectfully submitted, this the 9th day of October, 2026.


**NELSON MULLINS RILEY**
**& SCARBOROUGH LLP**

By: /s/ *Phillip J. Strach*
Phillip J. Strach (N.C. State Bar No. 29456)
Alyssa M. Riggins (N.C. State Bar No. 52366)
Cassie A. Holt (N.C. State Bar No. 56505)
Jordan A. Koonts (N.C. State Bar No. 59363)
Kacie T. England (N.C. State Bar No. 62343)
301 Hillsborough Street, Suite 1400
Raleigh, NC 27603
T: (919) 329-3800
F: (919) 329-3799
phil.strach@nelsonmullins.com
alyssa.riggins@nelsonmullins.com
cassie.holt@nelsonmullins.com
jordan.koonts@nelsonmullins.com
kacie.england@nelsonmullins.com

*Counsel for NCSBE Defendants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this memorandum complies with the length and typeface requirements set forth in this Court's Local Rules, as it contains 6,232/6,250 words, excluding those portions exempted by the Rules, as indicated by the word processing software used in making this document, and the document is written in size 13, Times New Roman font.

Respectfully submitted, this the 9th day of October, 2026.

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

/s/ *Phillip J. Strach*
Phillip J. Strach (N.C. State Bar No. 29456)

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing has been served on all parties to this action by filing the same with the Court's CM/ECF system, which will send a notice of electronic filing to all counsel of record for the parties.

This the 9th day of October, 2026.

By: /s/ *Phillip J. Strach*
Phillip J. Strach (N.C. State Bar No. 29456)
Alyssa M. Riggins (N.C. State Bar No. 52366)
Cassie A. Holt (N.C. State Bar No. 56505)
Jordan A. Koonts (N.C. State Bar No. 59363)
Kacie T. England (N.C. State Bar No. 62343)
301 Hillsborough Street, Suite 1400
Raleigh, NC 27603
T: (919) 329-3800
F: (919) 329-3799
phil.strach@nelsonmullins.com
alyssa.riggins@nelsonmullins.com
cassie.holt@nelsonmullins.com
jordan.koonts@nelsonmullins.com
kacie.england@nelsonmullins.com

*Counsel for NCSBE Defendants*