IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| NORTH CAROLINA ALLIANCE FOR RETIRED AMERICANS et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | 1:26cv965 |
| NORTH CAROLINA STATE BOARD OF ELECTIONS et al., | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge.

Before the court is the motion for preliminary injunction by Plaintiffs North Carolina Alliance for Retired Americans, North Carolina Asian Americans Together, Down Home North Carolina, Vaeme Afokpa, and Raquel Nelson. (Doc. 5.) Plaintiffs challenge guidance from Defendant North Carolina State Board of Elections ("State Board") relating to the treatment of absentee ballots for the ongoing fall 2026 election and its implementation by Defendants Guilford County Board of Elections and Durham County Board of Elections and their members. The North Carolina Republican Party and the Republican National Committee ("Intervenors") were permitted to intervene as Defendants. The motion is fully briefed, and the court held a hearing on an expedited basis on October 14, 2026. For the following reasons, the motion will be denied.

## I. BACKGROUND

North Carolina permits voting in myriad ways, including by absentee ballot upon request. N.C. Gen. Stat. § 163-226. A qualified voter may request an absentee ballot for any reason or no reason at all. N.C. Gen. Stat. § 163-230.1. The county board must then mail the voter certain items, including an absentee ballot and container-return envelope, which contain specific instructions for the voter and for which there are specific statutory requirements. N.C. Gen. Stat. § 163-230.1(a)(1)-(4).

The county board is required to print an application on the outside of the container-return envelope that includes a certification by the absentee voter – by signature – that he or she voted the ballot enclosed in the container-return envelope, as well as a space for the names, signatures, and addresses of two witnesses or one notary public who witnessed the voter casting the ballot enclosed in the container-return envelope. Id. § 163-229(b)(1), (b)(3); 163-231(a)(6). After marking the absentee ballot, the voter must submit it to the county board in the container-return envelope. Id. § 163-231(b).

North Carolina statutory law sets out specific requirements as to the absentee ballot, including the following:

- The voter must place his or her "folded ballots in the container-return envelope and securely seal it, or have this done in the voter's presence." Id. § 163-231(a)(3).

- The application for absentee ballot "shall be completed and signed by the voter personally, the absentee ballots marked, the absentee ballots sealed in the container-return envelope, and the certificate [on the sealed container-return envelope] completed" as required by statute. Id. § 163-230.1(d).

The State Board has "general supervision over the primaries and elections in the State" along with "authority to make such reasonable rules and regulations with respect to the conduct of primaries and elections as it may deem advisable," subject to statutory limitations. N.C. Gen. Stat. § 163-22(a). Pursuant to this authority, the State Board "advise[s] county boards of elections as to the proper methods of conducting primaries and elections." Id. § 163-22(c). Directives to county boards "typically take the form of 'Numbered Memos,' from the State Board's Executive Director to county boards of elections regarding election administration." (Doc. 1 ¶ 57; see also N.C. Gen. Stat. § 163-132.4 (State Board's director may "promulgate directives concerning its duties and those of the county boards of elections").)

On February 2, 2026, following separate litigation involving Plaintiff North Carolina Alliance for Retired Americans, the State Board issued a declaratory ruling that certain instructions relating to absentee ballots in the then-current numbered memo, the 2024 version of Numbered Memo 2021-03 (the "2024 Numbered Memo"),

were "not correct and must be revised." (Doc. 1-3 at 10.)[1] Thereafter, the State Board proposed new rules regarding absentee voting on April 13, 2026 and adopted them in July. (Doc. 1 ¶ 60.) North Carolina's Rules Review Commission approved those rules on August 27, 2026. (Id. ¶ 61.) However, the Rules Review Commission received the requisite number of objections to the State Board's rules to require legislative approval. (Id.; see N.C. Gen. Stat. § 150B-21.3(b2)). The State Board represented at oral argument that the General Assembly has not met, and will not meet until after the 2026 election cycle, to approve the rules.

On September 4, 2026, the State Board, pursuant to its statutory authority, issued an updated version of Numbered Memo 2021-03 (the "2026 Numbered Memo") that incorporated the new rules. At issue are two provisions: what Plaintiffs term the "Sealing Requirement" and the "Signature Verification Requirement" (collectively, the "Challenged Provisions").

### A. Sealing Requirement

In North Carolina, an absentee ballot package contains two

[1] The decision stemmed in part from litigation initiated by Intervenors in this case in which the North Carolina Alliance for Retired Americans intervened. (See Doc. 48-1.) That litigation, Wasserberg et al. v. North Carolina State Board of Elections et al., Case No. 5:24CV00578 (E.D.N.C.), resulted in a consent judgment whereby the State Board agreed to reconsider Intervenors' previous request for a declaratory ruling with respect to the interpretation of certain provisions of the 2024 Numbered Memo, including that spoiling ballots submitted in unsealed container-return envelopes would violate the Materiality Provision of the Civil Rights Act of 1964. (See Doc 48-1 ¶ 15.)

envelopes: an outer envelope, and an inner envelope known as the "container-return envelope." The absentee ballot must by statute be "sealed in the container-return envelope." N.C. Gen. Stat. § 163-230.1(d). The ballot container-return envelope itself contains "**Instructions**" on the flap that advise: "1. Place your marked ballot this envelope **and seal the envelope**. *Do not seal anything else inside this envelope*." (Doc. 55-2 at 70 (emphases in original).)

Both the 2024 and 2026 Numbered Memos set out rules as to when ballots can be accepted, notwithstanding defective sealing of either the inner or outer envelope. Under the 2024 Numbered Memo, a ballot was "spoiled" – meaning it would not be counted and cannot be cured, requiring the voter to cast a new ballot – if both the outer envelope and the container-return envelope arrived unsealed, or appear to have been opened and re-sealed. (Doc. 5-3 at 4.) However, if either the outer envelope or container-return envelope arrived sealed, then there was no deficiency, meaning the ballot would be counted without further action from the voter. (Id. at 4-5.) The 2024 Numbered Memo reasoned that if either envelope was sealed, "the ballot was received in a sealed envelope and is therefore not deficient" under the statute. (Id.)

As noted, this practice was challenged by the North Carolina Republican Party and the Republican National Committee, and pursuant to the parties' consent judgment in that case requiring

the State Board to revisit the practice, the State Board thereafter issued its February 2, 2026 declaratory ruling that the 2024 Numbered Memo's directive to accept absentee ballots which are not sealed in the container-return envelope was "not correct." (Doc. 5-5 at 7.) The State Board reasoned that "the same chain of custody concerns could be present" with an unsealed container-return envelope as when the outer envelope is not sealed. (Id.) Further, the State Board noted that "it could be that someone else had access to the voter's ballot after the ballot left the voter's possession and before the outer envelope was later sealed." (Id.) As a result, the State Board concluded that the 2024 Numbered Memo would be "replaced after the canvass of the March 2026 primary, such that the current guidance will at the time be applied prospectively." (Id. at 12.)

As noted above, the State Board engaged in rulemaking and promulgated new rules in the spring of 2026 consistent with this new guidance.

On September 4, 2026, the State Board issued the 2026 Numbered Memo. Under that guidance, there is no deficiency if the container-return envelope is sealed, regardless of whether the outer envelope is unsealed or appears to have been opened and re-sealed. (Doc. 5-2 at 12.) If the container-return envelope has been opened and re-sealed, but the outer envelope is properly sealed, that is a curable "irregularity"; the voter may cure this irregularity by

submitting an attestation. (Id. at 13.) However, if the container-return envelope has been opened and re-sealed and the outer envelope has been opened and re-sealed, is unsealed, or if there is no outer envelope at all, that is a non-curable deficiency. (Id. at 8.) Finally, if the container-return envelope is unsealed or the ballot is outside the container-return envelope altogether, that is an "irregularity" that "require[s] the ballot to be spoiled and reissued," regardless of how the outer envelope is sealed. (Id. at 14.) The State Board based this guidance on North Carolina General Statute § 163-230.1(d), which requires that ballots be "sealed in the container-return envelope." (Id. at 8 n.23.)

The 2026 Numbered Memo also addresses timing. In the case of a non-curable deficiency or irregularity that is identified by the Friday before election day, election "staff shall within one business day . . . spoil the returned absentee ballot and reissue the absentee ballot package to the voter." (Id. at 11 (emphasis removed).) The reissued ballot package includes "a written notice," which identifies the deficiency, explains what the voter needs to do, and "inform[s] the voter of their options to vote in person during the early voting period or on [e]lection [d]ay." (Id. at 12.)

If a non-curable deficiency or irregularity is identified on or after the Saturday before election day, then "staff shall, on the same day the deficiency is identified, contact the voter."

(Id.) Election staff will tell the voter that: (1) their ballot must be spoiled, and why; (2) there is not enough time to mail them another absentee ballot package that can be timely returned by mail; and (3) "they may vote in-person during the early voting period or on Election Day, if there is still time to do so." (Id. at 12-13.)

### B. Signature Verification Requirement

The statute requires that an absentee ballot be returned to the applicable county board of elections inside the container-return envelope. On the outside of the container-return envelope the voter must sign a certification attesting to his or her eligibility to vote (i.e., U.S. citizen, at least 18 years old, not a felon, etc.). (Doc. 55-2.) The container-return envelope specifically provides: "**Step 2: Voter, sign and complete below.**" (Doc. 55-2 at 70. (bold in original).) Below that is a box highlighted in cream color with an "**X**" and above the box the words: "**Voter, sign here.**" (Id. (bold in original).) The instructions note that the voter's signature must be witnessed by two qualified persons, or a notary. (Id.)

Under the 2026 Numbered Memo, there are three relevant scenarios involving a signature. The first is if the voter "did not sign or make their mark." (Doc 1-1 at 3.) This is a curable deficiency. (Id.) The second is if "[t]he voter's signature on the application is the name of a person other than the voter

assigned the application number on the container-return envelope."[2] (Id. at 8.) This is a non-curable deficiency. (Id.) The third is "[i]f the voter's signature appears to be the name of the voter assigned the application number on the container-return envelope . . . absent clear evidence to the contrary." (Id. at 4.) In this case, the signature is compliant and "is not a deficiency even if the signature is illegible." (Id.)

Plaintiffs claim that the 2026 Numbered Memo requirement that "[i]f there is a signature for the voter, county boards must review the signature on the application to ensure that the signature on the application is the name of the voter assigned the application number on the container return envelope" is new and unlawful. (Id. at 3.) Additionally, the 2026 Numbered Memo removed the prior guidance that "[t]he voter's signature on the envelope shall not be compared with the voter's signature in their registration record." (Doc. 1-2 at 3.) Finally, the 2026 Numbered Memo removed the prior header titled, "No Signature Verification," along with the statement that "[v]erification of the voter's identity is completed through the witness requirement." (Id.)

Notably, both the 2026 Numbered Memo and its predecessor had a similar standard for analyzing and accepting signatures. The

[2] I.e., where there is "clear evidence" that the signature is not the name of the voter. However, "[i]f the voter's signature is the same signature as an assistant's signature on the application," meaning that the assistant signed where the voter was supposed to or vice versa, "that is a curable deficiency." (Doc. 1-1 at 10.)

2024 Numbered Memo stated:

> [c]ounty boards shall accept the voter's signature on the ballot envelope if it appears to be made by the voter, meaning the signature on the envelope appears to be the name of the voter and not some other person. Absent clear evidence to the contrary, the county board shall presume that the voter's signature is that of the voter, even if the signature is illegible.

(Id.) Additionally, the 2024 Numbered Memo stated that it was a non-curable deficiency if "the witness or assistant signed in place of the voter's signature." (Doc. 5—3 at 7.) Likewise, the 2026 Numbered Memo provides:

> [i]f the voter's signature on the application appears to be the name of the voter assigned the application number on the container-return envelope, and not some other person, then that is not a deficiency even if the signature is illegible. Absent clear evidence to the contrary, the county board shall presume that the voter's signature is that of the voter, even if the signature is illegible.

(Doc. 1-1 at 4.)

**C. Parties**

Plaintiff North Carolina Alliance for Retired Americans is a nonprofit that works to "ensur[e] that their members are able to vote and have their votes counted." (Doc. 1 ¶ 15.) Plaintiff North Carolina Asian Americans Together is a nonprofit organization that "effectuates its mission in part by helping as many of its members and constituencies as possible to vote and have those votes counted." (Id. ¶ 16.) Plaintiff Down Home North Carolina is a nonprofit that works, in part, to ensure that rural, working-class people in North Carolina have access to voting. (Id. ¶ 17.)

Plaintiff Vaeme Afokpa is a registered voter in Durham County who "planned to vote absentee by mail" but now fears, due to the Challenged Provisions, that "her absentee ballot may be invalidated by her county board of elections based on immaterial errors or arbitrary judgments." (Id. ¶ 18.) Plaintiff Raquel Nelson is a registered voter in Guilford County who contends she "is unable to vote in person on [e]lection [d]ay due to her academic class schedule and professional responsibilities"[3] but "fears that her absentee ballot may be invalidated by her county board of elections based on immaterial errors or arbitrary judgments." (Id. ¶ 20.)

All Plaintiffs have sued the State Board, Sam Hayes in his official capacity as its Executive Director, Francis X. De Luca in his official capacity as its Chair, and Jeff Carmon, Angela Hawkins, and Siobhan O'Duffy Millen in their official capacities as members of the State Board. (Id. ¶¶ 20-26.) Further, all Plaintiffs have sued the Durham County Board of Elections, David K. Boone in his official capacity as its Chair, Pamela A. Oxendine in her official capacity as its Secretary, and James P. Weaver, Dawn Y. Baxton, and Natalie F. Beauchaine in their official capacities as its members. (Id. ¶¶ 27-32.) Finally, all Plaintiffs have sued the Guilford County Board of Elections, Eugene Lester III in his official

[3] She contends that there is no early voting location at her school, UNC Greensboro, and she would have to take an Uber or Lyft to vote in person. "[H]owever, that option is costly and requires [her] to pull from [her] limited budget that [she] would otherwise spend on tuition and books." (Doc. 5-14 ¶ 8.)

capacity as its Chair, and Carolyn Bunker, Felita Donnell, Kathryn Skeen Lindley, and Peter Francis O'Connell in their official capacities as its members. (Id. ¶¶ 33-38.)

On October 6, 2026, Intervenors sought intervention as Defendants, and the court granted that motion on October 9. (Doc. 53.)

**D. Procedural Background**

The 2026 Numbered Memo was issued on September 4, 2026. (Doc. 1-1.) Plaintiffs filed their complaint on September 22, 2026 with the following claims: (1) 42 U.S.C. § 1983, violation of the "Materiality Provision" of the Civil Rights Act of 1964, 52 U.S.C. § 10101(a)(2)(B); (2) 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201-2202, denial of Procedural Due Process under the Fourteenth Amendment of the United States Constitution; (3) 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201-2202, denial of Equal Protection under the Fourteenth Amendment; and (4) 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201-2202, undue burden on the right to vote under the First and Fourteenth Amendments. (Doc. 1 ¶¶ 124-173.)

Six days later, on September 28, 2026, Plaintiffs moved for a preliminary injunction, seeking to enjoin Defendants "from enforcing or otherwise giving any effect to the Sealing Requirement and the Signature Verification Requirement, as set forth in Revised

Numbered Memo 2021-03." (Doc. 5 at 1.)[4] This motion came the day before the first public absentee ballot meetings were held by county boards of elections. (Doc. 55-2 ¶ 19.) Those county boards are and have been using the 2026 Numbered Memo to determine whether absentee ballots should be counted. (See id. at 41, 49.) As of October 8, approximately 123,828 absentee ballots were requested and approximately 25,612 absentee ballots were cast statewide. (Id. ¶ 14.) At the hearing on the motion, the State Board represented that 31,582 such ballots had been cast as of that date. Plaintiffs filed with their motion declarations from three experts, Doctors Kenneth Mayer, Linton A. Mohammed, and Maxwell Palmer, declarations from the individual Plaintiffs and representatives of the organizational Plaintiffs, and declarations from four county board of elections members.

On October 9, 2026, all Defendants filed responses to Plaintiffs' motion for preliminary injunction. The State Board filed with their response a declaration from an expert, Doctor Michael Barber, along with a declaration from Adam Steele, Deputy General Counsel for the State Board. The Guilford County and Durham County Defendants took no position on Plaintiffs' motion. (Doc. 52.) The Intervenors and State Board oppose the motion. (Docs.

[4] Though Plaintiffs' motion requests only a total ban on enforcement of the Challenged Provisions, Plaintiffs argue in their briefs that the court should also consider requiring "cure procedures" for failures to seal the container-return envelope and signatures not in the voter's name. (See Doc. 6 at 23, Doc. 57 at 17.)

54, 55.) Plaintiffs submitted a reply brief on October 12. (Doc. 57.) On October 14, the court held a hearing on the motion, which is now ready for decision.

## II. ANALYSIS

### A. Standing

The State Board argues that Plaintiffs lack standing. "No lawsuit may proceed in federal court unless the party seeking relief has Article III standing." Carolina Youth Action Project v. Wilson, 60 F.4th 770, 778 (4th Cir. 2023). "This showing is particularly important when political organizations try to vindicate the rights of individual voters mere weeks before a national election[.]" Republican Nat'l Comm. v. N.C. State Bd. of Elections, 120 F.4th 390, 408 (Diaz, C.J., concurring). Because standing questions the court's authority to act, the court addresses it first.

To have standing, a plaintiff must show: (1) he has suffered an "injury in fact," (2) the injury is "fairly . . . trace[able] to the challenged action of the defendant," and (3) it is "likely" that "the injury will be 'redressed by a favorable decision.'" Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992) (alteration and omission in original) (citations and internal quotation marks omitted) (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 27, 38 (1976)). In multi-plaintiff cases, "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint." Town of Chester v. Laroe Estates, Inc., 581 U.S. 433,

439 (2017). If there is one such plaintiff, the court need not consider whether other plaintiffs have standing to seek that same form of relief. Carolina Youth Action, 60 F.4th at 778 (citing Town of Chester, 581 U.S. at 439.

The three elements of standing will be addressed in turn.

### 1. Injury-in-Fact

The State Board contends that the alleged injuries "depend on the speculative chain of possibilities [that] Article III forbids." (Doc. 55 at 11.) It argues that the individual Plaintiffs "allege that they fear future signature review and envelope issues, but neither alleges they will submit a noncompliant ballot, their ballots were rejected, or that in-person voting or cure procedures will be unavailable." (Id.) For the organizational Plaintiffs, the State Board argues that "their diversion-of-resources theory fails under" FDA v. All. for Hippocratic Med., 602 U.S. 367 (2024), and that "no organizational Plaintiff identifies a member who has suffered a concrete harm."[5] (Id.)

Plaintiffs counter that they have identified various harms. First, they point to predictions about how many ballots will be "invalidated . . . statewide over the course of the election." (Doc. 57 at 18.) Second, they contend that Afokpa and "Down Home's

[5] The State Board also cites N.C. All. for Retired Ams. v. Hirsch, 741 F.Supp.3d 318, 330-32 (E.D.N.C. 2024), where the court rejected a similar challenge by the North Carolina Alliance for Retired Americans for lack of standing. (Doc. 55 at 11.)

member Robert Thatcher Mitton III have explained that they intended to vote absentee but likely will not because of concern about the Challenged Provisions." (Id.) Third, for the "many members" of the Organizational Plaintiffs who "cannot vote in person," they "cannot avoid the Provisions' risks of disenfranchisement." (Id.) Finally, Plaintiffs contend that the Organizational Plaintiffs' core missions are directly affected by the Challenged Provisions, granting them standing. (Id. at 18-19.)

The injury in fact "requirement ensures that plaintiffs have a 'personal stake in the outcome of the controversy.'" Kenny v. Wilson, 885 F.3d 280, 287 (4th Cir. 2018) (quoting Warth v. Seldin, 422 U.S. 490, 498 (1975)). An injury in fact is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, Inc. v. Robins, 578 U.S. 330, 339, (2016) (quoting Lujan, 504 U.S. at 560). "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 158 (2014) (citation and internal quotation marks omitted). When plaintiffs seek prospective relief, they must establish an ongoing or imminent injury in fact. O'Shea v. Littleton, 414 U.S. 488, 495–96 (1974).

An organizational plaintiff can satisfy the standing requirements in two ways: either injury in its own right, or injury

as a representative of its members. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 600 U.S. 181, 199 (2023). To have standing in its own right, the organization may show that alleged illegal actions "directly affect[] and interfere[] with [the organization's] core business activities." All. for Hippocratic Med., 602 U.S. at 395; accord Republican Nat'l Comm., 120 F.4th at 410 (Diaz, C.J., concurring).

An organization does not have standing, however, where injury results "not from any actions taken by [the defendant], but rather from the [organization's] own budgetary choices," such as "educating members, responding to member inquiries, or undertaking litigation in response to legislation." Lane v. Holder, 703 F.3d 668, 674-75 (4th Cir. 2012) (internal quotation marks and citation omitted) (finding lack of standing where resource drain resulted from "inquiries [from members] into the operation and consequences of interstate handgun transfer provisions").

Here, organizational Plaintiff North Carolina Asian Americans Together ("NCAAT") has alleged that a "key tenet" of its "mission is to equip Asian Americans statewide for civic engagement and movement building by providing our constituents with resources, training, and education to advance a long-term social justice agenda." (Doc. 5-11 ¶ 6.) NCAAT alleges that they will "need to create other new voter education materials in response to the new policies." (Id. ¶ 19.) At oral argument, Plaintiffs' counsel

explained that in their voter education materials, the organizational Plaintiffs emphasize requirements that, if not followed, will result in a ballot being spoiled. Since the 2026 Numbered Memo creates new categories for spoilation, the organizational plaintiffs must "create . . . new voter education materials." (Doc. 5-11 ¶ 6.)

At this preliminary stage, the court accepts that NCAAT has demonstrated a likelihood of standing. It has claimed "a frustration of their mission of [promoting civic engagement] and a diversion of resources" as a result of the 2026 Numbered Memo. Voto Latino v. Hirsch, 712 F. Supp. 3d 637, 659 (M.D.N.C. 2024); see also Republican Nat'l Comm., 129 F.4th at 396-97 (organizations with a common core mission of "promoting Republican voter engagement and electing Republican candidates" possessed standing where they alleged the state's violations of federal law "forced them to divert significantly more of their resources into combatting election fraud in North Carolina" and those efforts "frustrated their organizational and voter outreach efforts"); Common Cause Ind. v. Lawson, 937 F.3d 944, 952-53 (7th Cir. 2019) (collecting cases and upholding standing of voter advocacy organizations that challenged election laws based on drains on their resources); Democracy N.C. v. De Luca, No. 1:23-CV-878, 2026 WL 836812, at *4 (M.D.N.C. Mar. 26, 2026) (organizations who were "forced to spend additional time and resources to achieve their mission to educate and register

would-be voters" had standing to challenge election laws). It is curious, however, that no such "new voter registration materials" have been brought to the court's attention despite the fact that Plaintiffs' lawsuit was brought well after the 2026 Numbered Memo was issued (such that the claimed educational guidance, if necessary, should have been addressed by now if it were a concern). Whether standing remains must await consideration another day.

### 2. Causation and Redressability

The State Board contends that the Plaintiffs cannot establish causation or redressability. The State Board argues that "Plaintiffs seek relief based on a chain of alleged future ballot rejections not directly caused by the Numbered Memo . . . their theory [] depends on independent contingencies: voter failure to comply with the printed instructions provided to each absentee voter, county review, timing, and the voter's inability or unwillingness to use . . . notification options." (Doc. 55 at 12.) Likewise, the State Board contends that "Plaintiffs' expert . . . admits that, in 2024, ballots were rejected because 'the signature on the absentee ballots was not the name of the voter.'" (Id. (quoting Doc. 5-7 at 15).) As a result, "an injunction here fails to address the statutory requirement or the previous practices allowing the very thing Plaintiffs complain of here." (Id. at 13.)

Plaintiffs counter that "[t]he Challenged Provisions create

spoiling requirements that do not exist in statute and did not exist under the prior Numbered Memo." (Doc. 57 at 19.) Plaintiffs characterize the harm as "the predictable effect of" the Numbered Memo "on the decisions of third parties." (Id. quoting Dep't. of Com. v. New York, 588 U.S. 752, 768 (2019)).) Finally, Plaintiffs contend that an injunction would "revert[] to the status quo under which application-envelope and signature-verification issues did not require spoiling." (Id.)

To show causation, Plaintiffs "must show that their injury can be traced to the State Board's actions, and did not result from the independent action of a non-party to the case." Republican Nat'l Comm., 120 F.4th at 397. To show redressability, "Plaintiffs must show that it is likely, and not merely speculative, that a favorable decision from the federal court will remedy their injury." Id. "The burden under [the redressability] prong is 'not onerous' and requires Plaintiffs to show only that they 'personally would benefit in a tangible way from the court's intervention.'" Id. (quoting Disability Rts. S.C. v. McMaster, 24 F.4th 893, 903 (4th Cir. 2022)). Finally, "[s]tanding is not 'dispensed in gross'; instead, the court must consider standing with respect to the requested relief." Voto Latino, 712 F. Supp. 3d at 657 (quoting Town of Chester, 581 U.S. at 439).

Here, North Carolina state law – not the State Board of Elections – provides that "[t]he [absentee ballot] application

shall be completed and signed by the voter personally, the absentee ballots marked, the absentee ballots sealed in the container-return envelope." N.C. Gen. Stat. § 163-230.1(d) (emphasis added). However, Plaintiffs are correct that the statute does not require a ballot which is not sealed, nor one that is not signed by the voter personally, to be spoiled. Indeed, the 2026 Numbered Memo provides that if "[t]he voter did not sign or make their mark on the application," that is a curable deficiency. (Doc. 1-1 at 3.) Plaintiffs allege that the State Board could have made the failure to seal the container-return envelope and failed signature a curable deficiency. Based on their claims, Plaintiffs have demonstrated a likelihood "that their injury can be traced to the State Board's actions, and did not result from the independent action of a non-party to the case." Republican Nat'l Comm., 120 F.4th at 397. For the same reasons, a favorable court order in this case – enjoining the Challenged Provisions or requiring a cure process for all deficiencies – would likely redress the alleged harms in this case. Accordingly, NCAAT has made an initial showing of standing in this case. Given that conclusion, the court need not consider the standing of any other Plaintiff. See Carolina Youth Action, 60 F.4th at 778.

**B. Purcell**

Defendants contend that it would be improper for this court to act on Plaintiffs' motion for preliminary injunction under the

doctrine set out in Purcell v. Gonzalez, 549 U.S. 1 (2006) (per curiam). (Doc. 55 at 9 ("Purcell independently warrants denial of Plaintiffs' [m]otion").) While there is some suggestion that this could be considered as part of balancing of equities under the preliminary injunction consideration, see Hale v. Lee, No. 3:26-CV-00603, 2026 WL 1433312, at *7 (M.D. Tenn. May 21, 2026) (discussing Purcell principle while balancing the equities and public interest), it will be addressed separately first.

The State Board observes that "[a]s of the morning of October 8, 2026, approximately 123,828 ballots have been issued" (Doc. 55 at 9), and at the hearing on October 14, 2026, it represented that 31,582 had been cast. (Id.) Further, the State Board notes a "plethora of other deadlines" which county boards of elections must meet. (Id. at 10; see Doc. 55-2 at 59.) Finally, the State Board notes that in-person early voting began on October 15, and election day is November 3. (Doc. 55 at 10.)

Plaintiffs respond that Purcell focuses on voter confusion and an injunction poses no such risk "because the relief would not require individual voters to alter their conduct at all" and would instead encourage them to vote absentee. (Doc. 57 at 20-21.) Further, Plaintiffs assert that election administration will not be burdened because an injunction "would not require any change to voter instructions." (Id. at 21.)

The Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." Republican Nat'l Comm. v. Democratic Nat'l Comm., 589 U.S. 423, 424 (2020). When articulating the Purcell principle, the Supreme Court has warned that "late-breaking, court-ordered rule changes can 'result in voter confusion and consequent incentive to remain away from the polls,' and thus undermine the 'confidence in the integrity of our electoral processes essential to the functioning of our participatory democracy.'" Bost v. Ill. State Bd. of Elections, 607 U.S. 71, 80 (2026) (quoting Purcell, 549 U.S. at 4-5) (alterations adopted).

Contrary to Plaintiffs' suggestion, the Purcell principle has not been limited to redistricting cases. (See Doc. 56 at 21 n.9.) Rather, the Supreme Court has applied Purcell specifically to injunctions involving absentee ballots. Two cases are illustrative.

First, in Democratic Nat'l Comm. v. Wisc. State Legislature, 592 U.S. 1039 (2020), the district court "extended the deadline for receipt of absentee ballots by six days." Id. at 1042 (Kavanaugh, J., concurring). Importantly, the district court did so "just six weeks before the November election and after absentee voting had already begun." Id. at 1044. The Seventh Circuit stayed the injunction, and the Supreme Court declined to vacate the stay. Id. at 1039. In a concurring opinion, the Chief Justice stated that

the district court's "interven[tion] in the thick of election season to enjoin enforcement of a State's laws" was "improper." Id. at 1039 (Roberts, C.J., concurring). Likewise, Justice Kavanaugh wrote that "the District Court changed Wisconsin's election rules too close to the election, in contravention of this Court's precedents." Id. at 1043 (Kavanaugh, J., concurring). "When an election is close at hand, the rules of the road should be clear and settled . . . [e]ven seemingly innocuous late-in-the-day judicial alterations to state election laws can interfere with administration of an election and cause unanticipated consequences." Id.

Second, in Andino v. Middleton, 592 U.S. 906 (2020), the district court "enjoined South Carolina's witness requirement for absentee ballots because the court disagreed with the State's decision to retain that requirement during the COVID-19 pandemic." Id. at 906 (Kavanaugh, J., concurring). The Supreme Court stayed the injunction "except to the extent that any ballots cast before this stay issues and received within two days of this order may not be rejected for failing to comply with the witness requirement." Id. at 906. Concurring, Justice Kavanaugh wrote that "[b]y enjoining South Carolina's witness requirement shortly before the election, the District Court defied [the Purcell] principle and this Court's precedents." Id. at 907 (Kavanaugh, J., concurring).

Here, "[t]he election is not merely 'close,' or even

'imminent' — it is happening right now." Pierce v. N.C. State Bd. of Elections, 97 F.4th 194, 227 (4th Cir. 2024) (quoting Purcell, 549 U.S. at 5) (alterations adopted). As of October 8, approximately 123,828 absentee ballots have been requested, and more than 25,000 have been cast statewide. (Doc. 55 ¶ 14.) These ballots have been analyzed at the 100 county boards of elections statewide under the 2026 Numbered Memo. An injunction at this point would require all county boards of elections to revisit previously rejected ballots to determine whether they could now be cured. Although Plaintiffs present three county board members[6] who state it would be feasible to do so (see Docs. 57-4 ¶ 11, 57-5 ¶ 11, 57-7 ¶ 11), "[e]ven feasible feats can cause the 'chaos and confusion' with which Purcell is concerned." Pierce, 97 F.4th at 229 (quoting Merrill v. Milligan, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring)).

Further, there remains the grave possibility of "unanticipated consequences," even if the proposed "late-in-the-day judicial alterations to state election laws" are "seemingly innocuous."

[6] Each of North Carolina's 100 counties has a five-member board of elections. See County Board of Elections, N.C. State Bd. of Elections, https://www.ncsbe.gov/about-elections/county-boards-elections (last visited Oct. 13, 2026). Plaintiffs' county board member declarations characterize the Signature Verification Requirement as "new" (Doc. 6 ¶ 19) and contend that they "do not know how to apply the new signature in a uniform way" (Doc 5-17 ¶ 9). However, this representation is contrary to and undermined by the 2024 Numbered Memo's explicit requirement that county boards determine whether the witness or assistant signed their name in the place designated for the voter to sign, which would constitute a non-curable deficiency. (Doc. 5-3 at 7.)

Democratic Nat'l Comm., 592 U.S. at 1043 (Kavanaugh, J., concurring). It is highly probable that some voters whose absentee ballot was spoiled under current practice have since voted either by another absentee ballot or in person during ongoing early voting. If an absentee ballot was spoiled because of a sealing issue, for example, which ballot should be counted? And what if the votes for candidates differed between ballots? The end result would be "alter[ing] the election rules on the eve of an election," Republican Nat'l Comm., 589 U.S. at 424, and "voter confusion and disruptive consequences," Pierce, 97 F.4th at 227. This is precisely what "the Purcell principle is designed to avoid." Id.

Plaintiffs fault the State Board for issuing the 2026 Numbered Memo on September 4, 2026. (Doc. 57 at 20.) However, "[w]hile federal courts should not impose changes close to an election, States are free to decide for themselves whether last-minute changes to an election are in their best interests." Allen v. Milligan, 608 U.S. 511, 514 (2026) (internal citations omitted); accord People Not Politicians v. Onder, No. 26A388, 2026 WL 2883222, at *2 (U.S. Sept. 25, 2026) (holding that the lower court incorrectly "cast[] blame on the Missouri Supreme Court for its September 3 decision prohibiting the use of the 2025 map," citing Allen).

At bottom, the Purcell considerations in this case are not meaningfully different from those in Andino and Democratic National Committee, absentee-ballot cases in which the Supreme Court stayed

an injunction and declined to lift a stay of an injunction, respectively. As in Democratic National Committee, absentee voting has already begun. See 592 U.S. at 1044 (Kavanaugh, J., concurring). Indeed, the injunction stayed in Democratic National Committee appears to be less disruptive than the relief requested here. In Democratic National Committee, the district court had only extended the deadline to receive absentee ballots. Id. at 1042. Here, Plaintiffs seek a change in how absentee ballots are evaluated which, unlike the issue in Democratic National Committee, requires boards of elections to revisit and review previously spoiled ballots, along with the challenge of implementing a new method of evaluating ballots in the midst of an election.

In short, an injunction at this stage would "def[y]" the Purcell principle and the Supreme Court's precedents. Andino, 592 U.S. at 907 (Kavanaugh, J., concurring). This alone merits denial of Plaintiffs' motion. See id. (stating Purcell was an "alternative and independent reason[]" to stay the relevant injunction).

"[T]he Purcell principle . . . might be overcome even with respect to an injunction issued close to an election if a plaintiff establishes at least the following: (i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the

election without significant cost, confusion, or hardship." Milligan, 142 S. Ct. at 881 (Kavanaugh, J., concurring); cf. Pierce, 97 F.4th at 229 (acknowledging Justice Kavanaugh's concurrence but concluding that "[t]hose prerequisites" had "not been shown" in that case). For the reasons explained here, Plaintiffs have not made this showing. Pierce, 97 F.4th at 229. At a minimum, the merits are far from "clear-cut," Plaintiffs have delayed in seeking the relief they now seek, and implementing the changes sought is infeasible at this stage in the midst of voting.

**C. Preliminary Injunction**

Alternatively, if Purcell were not to pose a limitation on this court's action on Plaintiffs' motion at this time, Plaintiffs fail to provide a "clear showing" they have met all factors necessary for preliminary relief.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). All four must be shown; the failure to succeed on any one dooms such a request. See Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship, 918 F.3d 353, 366 (4th Cir. 2019). Such an injunction "is an extraordinary remedy intended to protect the status quo and prevent irreparable harm

during the pendency of a lawsuit." Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017). To demonstrate a likelihood of success on the merits, "[a] plaintiff need not establish a 'certainty of success,' but must make a clear showing that he is likely to succeed at trial." Id. (quoting Pashby v. Delia, 709 F.3d 307, 321 (4th Cir. 2013)). Plaintiffs contend that the status quo is the 2024 Numbered Memo in part because they sought injunctive relief the day before the new guidance would be applied in reviewing any absentee ballots; whereas Defendants maintain that the status quo is the 2026 Numbered Memo which was in effect nearly three weeks before Plaintiffs filed this lawsuit such that Plaintiffs' request is for mandatory, not prohibitory, relief. Mandatory preliminary injunctions are "disfavored" and "warranted in the most extraordinary circumstances." Pierce, 97 F.4th at 209 (quoting Taylor v. Freeman, 34 F.3d 266, 270 n.2 (4th Cir. 1994)). "Mandatory preliminary injunctions do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the situation demand such relief." Wetzel v. Edwards, 635 F.2d 283, 286 (4th Cir. 1980).[7]

**1. Balance of Equities and Public Interest**

The balance of equities and public interest "merge when the

[7] Except as noted infra, because Plaintiffs fail to make a sufficient showing for a prohibitory injunction, the court need not consider whether they meet the even higher standard for a mandatory injunction.

Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009); see N.C. Gen. Stat. § 163-22(a) (State Board is a state agency). By definition, "[t]he public interest . . . favors permitting as many qualified voters to vote as possible." League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 247-48 (4th Cir. 2014). A preliminary injunction cannot be issued if the balance of the equities does not support one. See Winter, 555 U.S. at 25-26. When a court sits in equity, it "look[s] to the practical realities and necessities inescapably involved in reconciling competing interests." Lemon v. Kurtzman, 411 U.S. 192, 201 (1973) (plurality opinion).

A request for preliminary relief is equitable. As such, "equity ministers to the vigilant, not to those who sleep upon their rights." Pierce v. N.C. State Bd. of Elections, 713 F. Supp. 3d 195, 241 (E.D.N.C. 2024) (quoting Perry v. Judd, 471 F. App'x 219, 224 (4th Cir. 2012)), aff'd, 97 F.4th 194.

The State Board contends that "Plaintiffs' own delay strongly cuts against them." (Doc. 55 at 8.) Despite their awareness since at least February 2026 that the State Board had proposed the very rules they now challenge, Defendants argue, Plaintiffs "waited eighteen days [after issuance of the 2026 Numbered Memo] to file suit and another six days (less than 24 hours before meetings on absentee ballots began) to seek an injunction." (Id.) Intervenors similarly observe that "[s]ealing statutes were first enacted at

least more than 80 years ago" in North Carolina, "[y]et . . . Plaintiffs have never challenged the [sealing] statutes and instead waited until now, on the eve of an election, to file a lawsuit seeking a declaration that 'the Sealing Requirement violates the Materiality Provision.'" (Doc. 54 at 22-23 (quoting Doc. 1).)

Plaintiffs counter that Intervenors "fault[] [them] for not suing in 1939, before any Plaintiff existed." (Doc. 57 at 20 (internal citation omitted).) Plaintiffs observe that "[t]he [2026] Numbered Memo changed the rules for the 2026 election on September 4, and this is Plaintiffs' only opportunity to challenge these changes before the election." (Id.) Regarding the delay between the State Board's issuance of the 2026 Numbered Memo and their motion for a preliminary injunction, Plaintiffs state that they "require[d] a comprehensive record" because the State Board allegedly "violate[d] federal law in seven ways." (Id.)

Here, Plaintiffs waited eighteen days after the 2026 Numbered Memo was issued to file suit. (Doc. 1.) Rather than moving for a temporary restraining order, before the new guidance was used in absentee board meetings, Plaintiffs waited until one day before the first county boards of elections meetings to consider absentee ballots to move for a preliminary injunction. (Doc. 5.) Even under Plaintiffs' original proposed briefing schedule, they would not have submitted their reply brief until after the second absentee ballot boards of elections meetings had occurred. (See Doc. 26 at

1.) Purcell problems aside, this delay was significant.

As Defendants stated at the hearing, Plaintiffs cannot claim surprise. Plaintiff North Carolina Alliance for Retired Americans intervened in the Wasserberg litigation, where Intervenors sued the State Board to "rescind or delete all parts of the Numbered Memo that state or in any way imply that an absentee ballot received by a county board of elections may be counted even if the absentee ballot is not contained in a sealed container-return envelope." (Doc. 48-1 at 1, 4.) The consent judgment in the Wasserberg case required the State Board to reconsider Intervenors' request for a declaratory ruling, leading to the February Declaratory Ruling and the 2026 Numbered Memo. (See id. ¶ 15.) Further, the State Board's promulgation of formal rules adopting the Sealing Requirement and Signature Verification Requirement during the spring of 2026 were public record, receiving numerous comments from the public. (Doc. 1 at 19 nn. 3-5.) The Sealing Requirement, the Signature Verification Requirement, and the positions of the State Board and Intervenors were all known well before September 2026 and the State Board's update of the 2024 Numbered Memo were thus anticipated.

While Plaintiffs attempt to explain their delay in seeking injunctive relief, they offer no explanation for their delay in "bringing the complaint to court." Milligan, 142 S. Ct. at 881 (Kavanaugh, J., concurring) (emphasis added); cf. Hale, 2026 WL 1433312, at *7 (no undue delay when "Plaintiffs sought expedited

relief the day after the [challenged provision] became law"). The complaint did not have the "comprehensive record" that the motion for preliminary injunction had (Doc. 57 at 20); rather, the complaint's attached exhibits were the 2024 and 2026 Numbered Memos and two declaratory rulings from the State Board. (Docs. 1-1, 1-2, 1-3, 1-4.) Plaintiffs' explanations are unpersuasive, given the rapidity with which election law challenges historically have been brought by myriad parties.

Further, at the hearing, Plaintiffs' counsel argued that the <u>2024 Numbered Memo</u>'s signature verification requirements – which would be the status quo ante here - were unconstitutional. Plaintiffs' proposed remedy eliminates <u>any</u> verification of the signature, permitting a voter to sign <u>anyone</u>'s name to the certification, even "Mickey Mouse." Because the 2024 Numbered Memo stated that "[c]ounty boards shall accept the voter's signature on the ballot envelope <u>if it appears to be made by the voter</u>" (Doc. 5-3 at 2 (emphasis added) and required spoilation and re-issue of the ballot if the county board determined that "the witness or assistant signed in place of the voter's signature" (Doc. 5-3 at 7), Plaintiffs have disagreed with the directive to determine whether the signature is "made by the voter" for at least two years yet waited until the eve of the current election to bring their

challenge.[8] "[E]quity ministers to the vigilant, not to those who sleep upon their rights." Perry, 471 F. App'x at 224 (quoting Texaco P.R., Inc. v. Dep't of Consumer Affs., 60 F.3d 867, 879 (1st Cir. 1995)).

Accordingly, the court concludes that Plaintiffs have "unduly delayed [in] bringing the complaint to court." Milligan, 142 S. Ct. at 881 (Kavanaugh, J., concurring). Justice Kavanaugh's recommended "prerequisites have not been shown here." Pierce, 97 F.4th at 229. Given the grave Purcell issues in this case, coupled with Plaintiffs' delay in bringing their concerns about the Signature Verification Requirement to the court, this factor weighs against issuance of an injunction at this time. See Winter, 555 U.S. at 32-33.

**2. Likelihood of Success on the Merits**

Alternatively, the court considers whether Plaintiffs have made "a clear showing that [they are] likely to succeed at trial." Di Biase, 872 F.3d at 230 (citing Pashby, 709 F.3d at 321).

**a. Civil Rights Act**

Plaintiffs claim the Sealing Requirement violates the Civil

---

[8] As noted, Plaintiffs' contention at the hearing that the 2024 Numbered Memo did not present the same signature verification issues in practice as the 2026 Numbered Memo is contrary to the 2024 Numbered Memo's directive that if "the witness or assistant signed in place of the voter's signature, that deficiency cannot be cured and requires the ballot to be spoiled." (Doc. 5-3 at 7.)

Rights Act of 1964.[9] (Doc. 6 at 9.) Before the court "can address the constitutional arguments," it must "attempt to resolve" the motion "on non-constitutional grounds [first], if possible." Nat'l Lab. Rels. Bd. v. Enter. Leasing Co. Se., LLC, 722 F.3d 609, 613 (4th Cir. 2013); Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 347 (1936) (Brandeis, J., concurring). It thus turns to the statutory claim first.

Plaintiffs contend that the Sealing Requirement violates the "Materiality Provision" of the Civil Rights Act of 1964. (Doc. 6 at 9.) That provides that no person acting under color of law shall

> deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

52 U.S.C. § 10101(a)(2)(B). The parties dispute whether § 10101(a)(2)(B) applies.

Plaintiffs argue that § 10101(a)(2)(B) is implicated because "the Sealing Requirement denies the right to vote to any voter whose ballot it disqualifies." (Doc. 6 at 9.) They contend "that affected voters may cast a new ballot . . . does not" rectify the harm. (Id. at 10.) The container-return envelope, Plaintiffs

[9] Plaintiffs do not challenge the Signature Verification Requirement under this provision.

contend, "is precisely the sort of document Congress intended the Materiality Provision" to cover. (Id.)

The State Board responds that the Materiality Provision does not apply to the Sealing Requirement. (Doc. 55 at 15.) As an initial matter, the State Board notes a "circuit split on whether the Materiality Provision includes a private right of action," (Id. at 15 n. 11), and contends that it does not. Assuming there is a private right of action, the State Board argues that "a requirement unrelated to determining voter qualifications (like sealing the envelope) falls outside the Materiality Provision" because it is not "paperwork used to assess whether an individual is qualified to vote." (Id. at 15-16.)

Intervenors respond with four arguments. First, they argue that there are two stages of the voting "process." (Doc. 54 at 10.) At the first stage, "a voter must establish that he or she is qualified to vote." (Id. (citing Pa. State Conf. of NAACP Branches v. Sec'y Commonwealth of Pa., 97 F.4th 120, 130 (3d Cir. 2024), cert. denied sub nom. Pa. State Conf. of the NAACP v. Al Schmidt, 145 S. Ct. 1125 (2025)).) It is at this stage that the Materiality Provision is implicated, they contend. At the second stage, "a voter must properly cast his or her ballot according to state ballot-casting rules." (Id.) According to Intervenors, the Materiality Provision has no bearing on this stage (where the already-qualified voter has to follow the rules to actually cast

their ballot).

Second, Intervenors argue that "[a] voter is not denied the 'right to vote' when his or her absentee ballot is rejected due to a failure to comply with a state ballot-casting rule" because the voter may still vote in the election. (Id. at 14.) Third, Intervenors argue that the "application" on the container-return envelope is not an "application" within the meaning of the Materiality Provision. (Id. at 18.) Rather, it "is simply an application to cast an absentee ballot, not an application to register to vote." (Id.) Intervenors observe that "in order to even request an absentee ballot, a person must already be a qualified voter." (Id. (emphasis removed).) Finally, Intervenors contend that the failure to seal the container-return envelope is not an error or omission "on any record or paper relating to any application, registration, or other act requisite to voting" within the meaning of the Civil Rights Act, because the act of sealing an envelope "does not involve providing information on a record or paper." (Id. at 19-20.)

The Materiality Provision "has five elements: (1) the proscribed conduct must be engaged in by a person who is 'acting under color of law'; (2) it must have the effect of 'denying' an individual 'the right to vote'; (3) this denial must be attributable to 'an error or omission on a record or paper'; (4) the 'record or paper' must be 'related to an application, registration, or other

act requisite to voting'; and (5) the error or omission must not be 'material in determining whether such individual is qualified under State law to vote in such election.'" Ritter v. Migliori, 142 S. Ct. 1824, 1825 (2022) (Alito, J., dissenting from denial of stay) (cleaned up). Here, the parties contest whether sealing the container-return envelope is an "other act requisite to voting" within the meaning of § 10101(a)(2)(B).

Two circuit courts have adopted Defendants' view. The Third Circuit concluded that "the Materiality Provision targets laws that restrict who may vote. It does not preempt state requirements on how qualified voters may cast a valid ballot, regardless what (if any) purpose those rules serve." Pa. State Conf. of NAACP Branches, 97 F.4th at 131 (emphasis added). The Fifth Circuit endorsed the Third Circuit's conclusion, finding it "persuasive." United States v. Paxton, 148 F.4th 335, 340 (5th Cir. 2025).[10]

The court begins, as it must, with the text of the statute. See, e.g., Permanent Mission of India to the United Nations v. City of New York, 551 U.S. 193, 197 (2007). The Materiality Provision states that no person under color of law shall deny the right to vote "because of an error or omission on any record or

[10] Further, Justices Alito, Thomas, and Gorsuch have endorsed Defendants' view, finding that "[t]here is no reason why the requirements that must be met in order to register (and thus be 'qualified') to vote should be the same as the requirements that must be met in order to cast a ballot that will be counted. Indeed, it would be silly to think otherwise." Ritter, 142 S. Ct. at 1825 (Alito, J., dissenting from denial of stay).

paper relating to any application, registration, or other act requisite to voting." 52 U.S.C. § 10101(2)(B). Thus, the provision "applies to a record or paper related to an 'act requisite to voting.'" Liebert v. Millis, 733 F. Supp. 3d 698, 712 (W.D. Wis. 2024).

The difficulty for Plaintiffs' reading is that "[t]he same act cannot be both 'voting' and 'something necessary for voting' at the same time." Id. (citing Ritter, 142 S. Ct. 1826 n.2 (Alito, J., dissenting from denial of stay)). Indeed, as the district court in Liebert observed, "marking the ballot occurs before [sealing] the envelope, so how could [sealing] the envelope be 'requisite' to marking the ballot?" Id. at 713 (emphasis in original).

Additionally, the phrase "other act requisite to voting" must be read in the context of the specific words that precede it: "application" and "registration." Under the canon of ejusdem generis, "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." Pa. State Conf. of NAACP Branches, 97 F.4th at 131–32 (quoting Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 114–15 (2001) (explaining ejusdem generis)). It follows that the general phrase "other act requisite to voting" embraces other processes for determining voter qualifications. Liebert,

733 F. Supp. 3d at 714. Indeed, it must have meaning that Congress listed the specific terms "registration" and "application," "when it just as easily could have said the Materiality Provision applies to 'any record or paper relating to an act requisite to voting'" without the specific terms. Pa. State Conf. of NAACP Branches, 97 F.4th at 138. The fact that Congress added the words "registration" and "application" indicates that Congress intended to limit the general phrase "requisite to voting" with those specific terms.

The Materiality Provision must also be read in "the broader context of the statute as a whole." Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997). The prior subsection states that "in determining whether any individual is qualified under State law or laws to vote," no person acting under color of law should use a practice different from that applied to other individuals "who have been found by State officials to be qualified to vote." 52 U.S.C. § 10101(a)(2)(A) (emphasis added). The subsection after the Materiality Provision discusses employing "any literacy test as a qualification for voting." Id. § 10101(a)(2)(C) (emphasis added). The statutory context further demonstrates that the Materiality Provision reaches "determinations that affect a voter's eligibility to cast a ballot," not the rules around how to cast the ballot. Pa. State Conf. of NAACP Branches, 97 F.4th at 132.

Plaintiffs contend that the Sealing Requirement nevertheless

implicates the Materiality Provision because the container-return envelope "requires voters to attest to their qualifications to vote." (Doc. 57 at 6.) However, as Intervenors point out, one must already be a qualified voter to receive an absentee ballot. (Doc. 54 at 18.) North Carolina law states that "[a] qualified voter who is eligible to vote by absentee ballot . . . shall complete a request form for an absentee application and absentee ballots." N.C. Gen. Stat. § 163-230.1(a) (emphasis added). Thus, the "absentee application" is likely not an application to vote within the meaning of the Materiality Provision, because it is not a "determination[] that affect[s] a voter's eligibility to cast a ballot." Pa. State Conf. of NAACP Branches, 97 F.4th at 132.

Accordingly, assuming there is a private right of action available under the Materiality Provision, see Vote.Org v. Callanen, 89 F.4th 459, 478 (5th Cir. 2023), Plaintiffs have not shown a likelihood of success on their claim that the Sealing Requirement is covered by it.

**b. Equal Protection**

**i. Signature Verification Requirement**

Plaintiffs contend that the Signature Verification Requirement violates the Equal Protection Clause because it "will subject voters to precisely the sort of inconsistent standards and arbitrary ballot-counting rules the Supreme Court squarely foreclosed in Bush

v. Gore."[11] (Doc. 6 at 13.) Plaintiffs contend that the Signature Verification requirement is "standardless" and "provides no guidance on how to examine signatures or otherwise implement the requirement." (Id. at 14 (emphasis removed).) They emphasize the difficulty of handwriting analysis, citing to alleged "confusion . . . brewing across the state." (Id.) Finally, Plaintiffs allege that "the Numbered Memo does not state whether a purportedly unverifiable signature is a curable or non-curable defect." (Id. at 16.) All of these problems, according to Plaintiffs, "will inevitably subject North Carolinians to arbitrary and disparate treatment in violation of equal protection." (Id.)

The State Board counters that the Equal Protection Clause "does not invalidate a uniform statewide procedure based on speculation that local officials might later misapply it." (Doc. 55 at 17.) The State Board has provided a September 4, 2026 email sent by its Deputy General Counsel to the county boards of elections, which announces the issuance of the 2026 Numbered Memo that very day and advises that the Signature Verification Requirement "is not matching a signature against another signature – only making sure the name signed is the voter's name." (Doc. 55-2 at 41, 43.) Accordingly, the State Board contends that "Plaintiffs' signature-matching theory is a red herring." (Doc.

[11] 531 U.S. 98 (2000) (per curiam).

55 at 18.)

The cases Plaintiffs cite involve signature matching, where boards of elections were directed by statute to determine whether the signature on a ballot matched another signature. See Frederick v. Lawson, 481 F. Supp. 3d 774, 780 (S.D. Ind. 2020) (requiring review of whether "the signature of the voter on the application substantially conforms with the signature of the voter on the voter registration record"); Democratic Exec. Comm. of Fla. v. Lee, 915 F.3d 1312, 1316 (11th Cir. 2019) (discussing law requiring "[v]oting officials [to] . . . compare the signature on the certificate with the signature on file for that voter"); Saucedo v. Gardner, 335 F. Supp. 3d 202, 206 (D.N.H. 2018) (discussing requirement that election administrators "compare the signature on a voter's absentee-ballot application to the signature on an affidavit that the voter sends with the absentee ballot"); League of United Latin Am. Citizens of Iowa v. Pate, No. CVCV056403, 2019 WL 6358335 (Iowa Dist. Sept. 30, 2019) (same). Plaintiffs' expert reports also rely heavily on signature matching problems. (See Docs. 5-8 at 14-19; 5-9 at 10-14.) That is not at issue here.

In contrast to Plaintiffs' cited cases, the 2026 Numbered Memo directs county boards to determine whether "the voter's signature on the application appears to be the name of the voter assigned the application number on the container-return envelope." (Doc. 1-1 at 4 (emphasis added).) There is no requirement for election

administrators to "match" the voter's signature on the ballot with a prior signature. Indeed, in this regard the 2026 Numbered Memo has the same standard as the 2024 Numbered Memo, which directed county boards to "accept the voter's signature on the ballot envelope if it appears to be made by the voter, meaning the signature on the envelope appears to be the name of the voter and not some other person." (Doc. 1-2 at 3 (emphasis added).) In both cases, the question for the county board is the same: whether the signature on the ballot "appears to be the name of the voter." (Doc. 1-1 at 4; Doc. 1-2 at 3.) And both Numbered Memos directed, "[a]bsent clear evidence to the contrary, the county board shall presume that the voter's signature is that of the voter, even if the signature is illegible." (Doc. 1-1 at 4; Doc. 1-2 at 3.)

Plaintiffs further argue that, in the absence of an express prohibition on signature matching, county boards may go beyond determining whether the signature "appears to be the name of the voter" (Doc. 1-1 at 4) and attempt to match signatures. (Doc. 6 at 15; Doc. 5-15 ¶ 21.) Likewise, Plaintiffs' experts appear to presuppose that signature matching will occur. (See, e.g., Doc. 5-8 ¶¶ 15-16; Doc. 5-9 at 5, 15-16.)

Plaintiffs characterize the 2026 Numbered Memo's removal of an express prohibition on signature matching as an endorsement of signature matching. However, nothing in the 2026 Numbered Memo directs county boards of elections to engage in signature matching,

and the State Board's Deputy General Counsel's email to all county boards of elections advises that the Signature Verification Requirement "is not matching a signature against another signature — only making sure the name signed is the voter's name." (Doc. 55-2 at 41.)[12] "There is a presumption in North Carolina that public officials will execute their duties in good faith and in accordance with the law." Calliste v. City of Charlotte, 695 F. Supp. 3d 708, 731 (W.D.N.C. 2023) (citing Strickland v. Hedrick, 669 S.E.2d 61, 68 (N.C. Ct. App. 2008)), aff'd sub nom. Calliste v. Lor, No. 23-2158, 2025 WL 1743510 (4th Cir. June 24, 2025). "The Court cannot rely on speculation" that county election officials will perform ultra vires signature-matching "to support a request for injunctive relief." Beacon Sales Acquisition, Inc. v. Cameron Ashley Bldg. Prods., Inc., No. 1:25-CV-1820, 2025 WL 3721684, at *12 (E.D. Va. Dec. 23, 2025).[13]

---

[12] Plaintiffs submit affidavits from a handful of county board of elections members stating that they were not sent Steele's email, though they are all aware of the email's existence. (See Docs. 57-4, 57-5, 57-6.) However, none has disputed Steele's declaration that the email was sent "to all County Board of Elections Directors." (Doc. 55-2 at 3.) Moreover, the 2026 Numbered Memo itself appears to have been issued to the county boards of elections by publication on the State Board's Numbered Memos webpage. (Doc. 55-2 at 41.)

[13] Plaintiffs point to a single instance from the prior election cycle where "one absentee ballot was nearly invalidated because one Board Member believed that the signature on the inner application envelope was not similar enough to the signature on the photo identification exception form submitted alongside the envelope" and generally aver that "[a]ttempts to invalidate ballots based on signature mismatches became a pattern in [b]oard meetings." (Doc. 5-15 ¶ 21.) A single incident (where the ballot was ultimately counted) is insufficient to support Plaintiffs' constitutional claim. Cf. Hendon v. N.C. State Bd. of

The purpose of the 2026 Numbered Memo's updated Signature Verification Requirement, according to the State Board Deputy General Counsel's email, is to "make[] it more clear to review the voter's signature to see if it matches the name of the voter, [while] maintain[ing] the same standard for doing so." (Doc. 55-2 at 41.) This is credible given that Plaintiffs' proffered county board members apparently did not understand that, under the 2024 Numbered Memo, they were supposed to determine whether the signature on the voter's line was that of the "witness or assistant," (Doc. 5-3 at 7; see, e.g., Doc. 5-17 ¶ 8). Plaintiffs have not demonstrated a likelihood that the 2026 Numbered Memo will result in conflicting or varied application across all of North Carolina's 100 counties. Cf. Griffin v. N.C. State Bd. of Elections, 781 F. Supp. 3d 411, 430 (E.D.N.C. 2025) (finding Equal Protection violation when voters in some counties were "required to undertake additional efforts in order to have their votes counted"); Pierce v. Allegheny Cnty. Bd. of Elections, 324 F. Supp. 2d 684, 705 (W.D. Pa. 2003) (finding likely Equal Protection violation when county boards across the state had different policies for accepting hand-delivered absentee ballots). At the hearing, Plaintiffs argued

Elections, 710 F.2d 177, 182 (4th Cir. 1983) (observing that "not every election irregularity gives rise to a constitutional claim" and that "[w]hether the irregularity amounts to a constitutional claim depends on its severity, whether it was intentional or more of a negligent failure to carry out properly the state election procedures, and whether it erodes the democratic process.").

that the directive was defective because it lacked standards. But when asked what standards or guidance Plaintiffs contend would be necessary, Plaintiffs stated that none would suffice and that the court should therefore prohibit the State from rejecting absentee ballots that were attested to by someone whose name was not clearly the name of the voter to whom the ballot was assigned.

The Signature Verification Requirement raises closer questions than the Sealing Requirement. However, it is not enough for a plaintiff to raise "grave or serious" questions; "[t]he Winter requirement that the plaintiff clearly demonstrate that it will likely succeed on the merits is far stricter than . . . demonstrat[ing] only a grave or serious question for litigation." Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 346–47 (4th Cir. 2009) (emphasis in original), cert. granted, judgment vacated, 559 U.S. 1089, 130 S. Ct. 2371, 176 L. Ed. 2d 764 (2010), and adhered to in relevant part sub nom. The Real Truth About Obama, Inc. v. F.E.C., 607 F.3d 355 (4th Cir. 2010). Further, "district courts within the Fourth Circuit have recognized that 'when the facts are sharply disputed, a preliminary injunction will not be granted' because a preliminary injunction requires a 'clear showing.'" Price v. City of Fayetteville, N.C., No. 5:13-CV-150-FL, 2013 WL 1751391, at *4 (E.D.N.C. Apr. 23, 2013) (quoting Prudential Sec., Inc. v. Plunkett, 8 F. Supp. 2d 514, 516 (E.D.Va.1998)) (alterations adopted); accord Action NC v. Strach,

216 F. Supp. 3d 597, 641 (M.D.N.C. 2016) (denying preliminary relief when "[t]here [were] too many open questions" that "should be addressed on a complete and fully developed record").

Here, it is sharply disputed whether signature "matching" raises the same issues as determining whether the signature "appears to be made by the voter." Further, it is unknown whether any alternative standard (of which Plaintiffs offer none) would be more effective or uniform than the current standard, which "presumes the voter's signature is that of the voter, even if the signature is illegible." (Doc. 1-1 at 4.) Moreover, Plaintiffs' contention that the Signature Verification Requirement is "new" is contrary to the record.

Given the disputed facts in this matter, lack of precedent, and the absence of a proposed alternative standard for reviewing signatures, the court cannot conclude at this juncture that Plaintiffs have made a "clear showing" that they are likely to succeed on the merits of their Equal Protection claim as applied to the Signature Verification Requirement. Di Biase, 872 F.3d at 230.

**ii. Sealing Requirement**

Plaintiffs argue that the Sealing Requirement "compels counties to treat similarly situated voters differently." (Doc. 6 at 17.) In particular, they point to the fact that if a voter's outer return envelope is sealed but the inner application envelope

has been opened and re-sealed, "counties must allow voters to cure their ballot"; however, if the inner application envelope is unsealed (or not there at all), then counties "must invalidate" the ballot. (Id.) Plaintiffs contend there is "no reason for this differential treatment." (Id.)

The State Board counters that "the two groups [those who failed to seal their container-return envelope and those whose container-return envelope appears to be opened and re-sealed] committed different defects" which "present different evidentiary questions." (Doc. 55 at 20.) "An attestation cannot retroactively place a naked ballot in the required envelope or establish that an unsealed ballot remained protected from view or alteration after leaving the voter's possession." (Id. at 19-20.) As a result, those two groups "are not similarly situated" and Equal Protection "does not require they be treated identically." (Id. at 20.)

Courts have found that "disparate treatment between similarly situated voters, based solely on their casting of ballots in 'different counties,' amounts to 'a constitutional violation' of the Equal Protection Clause." Griffin, 781 F. Supp. 3d at 430 (quoting Bush, 531 U.S. at 107). In Griffin, the court found an equal protection violation when "overseas military and civilian voters who cast a ballot in Guilford County are required to undertake additional efforts in order to have their votes counted," but "[t]heir neighbors in Randolph, Alamance, and Rockingham

Counties" did not. Id. Other cases announce a similar principle. See, e.g., Gallagher v. N.Y. State Bd. of Elections, 477 F. Supp. 3d 19, 46 (S.D.N.Y. 2020) (relying on Bush v. Gore to find likely equal protection violation where election officials treated ballots differently "in Brooklyn as compared to the other boroughs"); see also Donald J. Trump for President, Inc. v. Boockvar, 493 F. Supp. 3d 331, 387 (W.D. Pa. 2020) ("Indeed, Bush's core proposition — that a state may not take the votes of two voters, similarly situated in all respects, and, for no good reason, count the vote of one but not the other — seems uncontroversial."); Pierce, 324 F. Supp. 2d at 705 (finding likely Equal Protection violation when county boards across the state had different policies for accepting hand-delivered absentee ballots).

Here, the Sealing Requirement is uniform across the state. There is no allegation that the Sealing Requirement is only being used to reject ballots in certain counties or will be susceptible to being applied differently to different voters who commit the same error. Cf. Griffin, 781 F. Supp. 3d at 430; Pierce, 324 F. Supp. 2d at 705. Accordingly, Plaintiffs have not shown a likely Equal Protection violation on the grounds that the Sealing Requirement is being applied unequally across counties or voters.

This leaves the question of whether the voter who does not seal his or her container-return envelope is "similarly situated in all respects," Donald J. Trump for President, 493 F. Supp. 3d

at 387, to the voter whose container-return envelope appears to have been opened and re-sealed. Plaintiffs cite Ne. Ohio Coal. for the Homeless v. Husted, 696 F.3d 580 (6th Cir. 2012) ("NEOCH") in support of the proposition that they are similarly situated. In NEOCH, the Sixth Circuit reviewed a consent decree that allowed voters who used their social security number ("SSN-4" voters) as identification to vote to cure their provisional ballots, if they could show that poll-worker error caused the ballot's rejection. Id. at 598. However, "[a] provisional voter using any other form of identification (e.g., current photo identification, copy of current utility bill, paycheck) receive[d] no such reprieve." Id. The Sixth Circuit held that this differential treatment of voters who use their social security number and voters who do not likely violated Equal Protection because of "its preferential treatment of SSN-4 provisional ballots." Id.

NEOCH is inapposite. There, the consent decree set different standards for different types of voters – i.e., those who use their SSN-4 and those who use any other form of ID – and treated the same errors made by different voters differently. Id. Here, the 2026 Numbered Memo treats different errors by the same voters (i.e., every absentee voter in the state) differently – namely, the difference between not sealing the container-return envelope at all (non-curable) and submitting a container-return envelope that appears to have been opened and re-sealed (curable). As the State

Board contends, "the two groups committed different defects and present different evidentiary questions, [so] they are not similarly situated." (Doc. 55 at 20.)

Therefore, the court concludes that Plaintiffs have not made a "clear showing" that they are likely to succeed on the merits of their Equal Protection claim as applied to the Sealing Requirement. Di Biase, 872 F.3d at 230.

**c. Due Process and Undue Burden**

Plaintiffs argue that the Challenged Provisions violate both procedural due process under Mathews v. Eldridge, 424 U.S. 319 (1976), and the First and Fourteenth Amendments under Anderson-Burdick, as set out in Anderson v. Celebrezze, 460 U.S. 780 (1983), and Burdick v. Takushi, 504 U.S. 428 (1992). (See Doc. 6 at 17-18, 21-22.)

As for due process, Plaintiffs argue that the right to vote is "a constitutionally protected liberty interest" within the meaning of procedural due process. (Doc. 6 at 22 (quoting Democracy N.C. v. N.C. State Bd. of Elections, 476 F. Supp. 3d 158, 227 (M.D.N.C. 2020)).) Further, they contend that "the Challenged Provisions are state action that will deprive many electors of their right to vote." (Id.) Finally, they contend that the challenged provisions do not provide proper notice or opportunity to be heard. (Id. at 22-23.) At the hearing, the court asked the parties for their positions on whether the Eldridge test applies

in this context. All argued they would prevail regardless of which test the court employed. The State Board contends, however, that there is no liberty interest at stake in this case.

The Fourth Circuit has not addressed whether the proper framework for analyzing procedural due process claims in the election context is the Anderson-Burdick framework or the Eldridge test. However, three circuits have concluded, either at the preliminary or permanent injunction stage, that "the Anderson/Burdick approach is better suited to the context of election laws than is the more general Eldridge test." Ariz. Democratic Party v. Hobbs, 18 F.4th 1179, 1195 (9th Cir. 2021) (quoting Richardson v. Tex. Sec'y of State, 978 F.3d 220, 234 (5th Cir. 2020)); see also New Ga. Project v. Raffensperger, 976 F.3d 1278, 1282 (11th Cir. 2020).[14] These conclusions rest on the Supreme Court's affirmative statements that a court considering a challenge to a state election law under the First and Fourteenth Amendments "must resolve such a challenge" under the Anderson/Burdick balancing test. Anderson, 460 U.S. at 789 (emphasis added); McIntyre, 514 U.S. at 345 (noting that Anderson/Burdick is suitable to cases involving "the mechanics of the electoral process"). The Supreme Court has applied this framework to various election laws,

[14] Additionally, this court has previously applied the Anderson-Burdick test to a due process claim in an election case. See Voto Latino, 712 F. Supp. 3d at 666.

including procedural challenges. See, e.g., Crawford, 553 U.S. at 190, (voter ID requirement); Rosario v. Rockefeller, 410 U.S. 752, 756–62 (1973) (registration deadline).

The court agrees with the Ninth, Fifth, and Eleventh Circuits that "[t]o the extent that the Eldridge test would strike a different balance . . . the Supreme Court's extensive jurisprudence on challenges to voting restrictions may [not] be discarded merely by raising the same challenge under the banner of procedural due process." Hobbs, 18 F.4th at 1195; see also Democratic Nat'l Comm. v. Wisc. State Legislature, 592 U.S. 1039, 1042 (2020) (Gorsuch, J., concurring) (expressing skepticism in judicial intervention in election regulations because "[l]egislatures enjoy far greater resources for research and factfinding . . . than usually can be mustered in litigation between discrete parties before a single judge"); Crawford v. Marion Cnty. Election Bd., 553 U.S. 181, 210 (2008) (Souter, J., dissenting) (endorsing Anderson-Burdick for its consideration of "the legitimacy of interests" in voting rights and in election regulation). Accordingly, the court will apply Anderson-Burdick to Plaintiffs' due process claims.[15] In light of

[15] As such, the court need not resolve Plaintiffs' contention that a liberty interest is at stake. See Democracy N.C., 476 F.Supp.3d at 227 ("The right to vote is a constitutionally protected liberty interest."); Barefoot v. City of Wilmington, 37 F. App'x 626, 635 n.5 (4th Cir. 2002) ("The right to vote—to the extent it exists and an individual has been deprived of it—is certainly a protected liberty interest, and the Due Process Clause requires fair and adequate procedures if an individual is deprived of his/her liberty.") (unpublished); but see League of Women Voters of Ohio v. Brunner, 548 F.3d 463, 479 (6th Cir. 2008) ("That

this determination, the court will resolve Plaintiffs' arguments as to their separate count claiming the Challenged Provisions unduly burden the right to vote under the Anderson-Burdick framework together. (Doc. 6 at 17.)

As to undue burden, Plaintiffs contend that the "disparate treatment of voters . . . requires heightened scrutiny." (Id. at 18.) Further, they argue that the Challenged Provisions will "disenfranchise hundreds, if not thousands, of voters – imposing at least a serious burden on voting rights." (Id. at 19 (emphasis removed).) They also contend that "no legitimate state interest justifies" the Challenged Provisions, so the provisions "fail any level of Anderson-Burdick scrutiny." (Id. at 20 (emphasis removed).)

Plaintiffs contend that the Signature Verification Requirement requires "at least heightened scrutiny" for two reasons. (Id. at 18 (emphasis removed).) First, they argue that the requirement "will, through its lack of standards, result in counties scrutinizing absentee-ballot signatures differently." (Id. at 19.) Second, Plaintiffs assert that the Signature Verification Requirement "will disenfranchise hundreds, if not thousands, of

---

Ohio's voting system impinges on the fundamental right to vote does not, however, implicate procedural due process[.]"); Richardson v. Tex. Sec'y of State, 978 F.3d 220, 232 (5th Cir. 2020) ("Though the plaintiffs will likely run into trouble in establishing that the right to vote is a liberty interest, they will have even greater difficulty showing that an alleged right to vote by mail constitutes a liberty interest.").

voters," including a "disproportionate[] burden [on] certain voters." (Id. at 19-20.)

As to the Sealing Requirement, Plaintiffs argue that it "triggers at least heightened scrutiny" for two reasons. (Id. at 18 (emphasis removed).) First, they argue that it "arbitrarily and facially distinguishes between voters who submit an unsealed and resealed inner application envelope (who may cure), and voters who do not seal the inner application envelope or submit a naked ballot (who may not)." (Id. at 19.) Second, they argue that the Sealing Requirement "will disenfranchise hundreds, if not thousands, of voters," having a "disproportionate[] burden [on] certain voters." (Id. at 19-20.)

The State Board counters that the Challenged Provisions do not create a severe burden on the right to vote. (Doc. 55 at 21.) The State Board notes that "[t]he Numbered Memo sets forth numerous ways for a voter to cure their ballot, or cast another," undercutting "the assumption that every affected voter is disenfranchised or unconstitutionally burdened simply because some may decline available alternatives." (Id. at 22.) As for the state interests, the State Board contends that "[t]he sealing directive enforces a statutory requirement and addresses chain-of-custody concerns." (Id.) Further, the State Board contends that the Signature Verification Requirement "helps confirm that the voter, rather than some other person, signed the [a]pplication."

(Id.)

The court must determine whether the burdens on voters' rights are severe, minimal, or "in between these two extremes." Obama for Am. v. Husted, 697 F.3d 423, 429 (6th Cir. 2012). Election regulations that impose a "severe" burden are subject to strict scrutiny. Pisano v. Strach, 743 F.3d 927, 933 (4th Cir. 2014). Such severe burdens are generally "invidiously" discriminatory by virtue of being "irrelevant to the voter's qualifications." Crawford, 553 U.S. at 189 (Stevens, J., announcing the judgment of the court) (citing Harper v. Va. Bd. of Elections, 383 U.S. 663, 666-67 (1966)). Generally, strict scrutiny "is the standard for cases where 'the State totally denied the electoral franchise to a particular class of residents, and there was no way in which the members of that class could have made themselves eligible to vote.'" Mays v. LaRose, 951 F.3d 775, 786 (6th Cir. 2020) (quoting Rosario, 410 U.S. at 758).

By contrast, "'evenhanded restrictions that protect the integrity and reliability of the electoral process itself' are not invidious and satisfy the standard set forth in Harper." Crawford, 553 U.S. at 189-90 (Stevens, J.) (quoting Anderson, 460 U.S. at 788 n.9). In such cases where the burden is "modest," "election laws . . . will be upheld if the state can 'articulate' its 'important regulatory interests.'" Buscemi v. Bell, 964 F.3d 252, 263 (4th Cir. 2020) (quoting Libertarian Party of Va. v. Alcorn,

826 F.3d 708, 716, 719 (4th Cir. 2016)). "The requirement that states articulate their asserted regulatory interests 'is not a high bar.'" Id. at 265 (quoting Alcorn, 826 F.3d at 719).

There is no "litmus test for measuring the severity of a burden that state law imposes on . . . an individual voter, or a discrete class of voters." Crawford, 533 U.S. at 191 (Stevens, J.). The court must consider both the "character and magnitude" of the alleged burden on voting, Burdick, 504 U.S. at 434 (quoting Anderson, 460 U.S. at 789), and then "make the 'hard judgment' that our adversary system demands," Crawford, 553 U.S. at 190 (Stevens, J.). Courts generally evaluate the burden from the perspective of all affected voters, "within the landscape of all opportunities that [the State] provides to vote." Mays, 951 F.3d at 784-85; see also Crawford, 553 U.S. at 198-99 (Stevens, J.) (reviewing burden on "most voters" where photo ID law applied to in-person voters); Tully v. Okeson, 977 F.3d 608, 617 (7th Cir. 2020) (reviewing burden on voters who could not vote absentee in light of "Indiana's electoral scheme as a whole"). Severe burdens must be "narrowly drawn to advance a state interest of compelling importance." Burdick, 504 U.S. at 434 (quoting Norman v. Reed, 502 U.S. 279, 289 (1992)). Non-severe burdens, by contrast, are subject to Anderson-Burdick's more flexible balancing standard, under which this court must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that

the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." Id. (quoting Anderson, 460 U.S. at 789). The balancing standard operates as a sliding scale: the greater the burden, the greater the justification must be. Id. The Fourth Circuit has previously considered the entirety of a state's ballot-access regulations when considering a challenge under Anderson-Burdick. Pisano, 743 F.3d at 933; see also Wood v. Meadows, 207 F.3d 708, 711 (4th Cir. 2000) ("When determining whether a given state's filing deadline unconstitutionally burdens candidates' and voters' rights, a court must examine that state's ballot access scheme in its entirety.").

The parties have not brought to the court's attention any case involving Sealing Requirements or Signature Verification Requirements (as opposed to signature matching) in other states. Thus, this appears to be an issue of first impression. However, one district court in this circuit considered a similar challenge to Virginia's notice and cure process, which plaintiffs argued "disenfranchise[d] voters who fail to fill out the absentee ballot correctly and are not given an opportunity to cure their mistake." Democratic Party of Va. v. Brink, 599 F. Supp. 3d 346, 362 (E.D. Va. 2022). The court analyzed the issue under Anderson-Burdick and observed that "the notice and cure process in this case can never

be said to disenfranchise a voter because, if a voter follows instructions, their vote will be counted." Id. (citing Rosario, 410 U.S. at 757-58). There, Virginia law required notice and an opportunity to cure to an absentee ballot by voters who made a mistake on completing their ballot if the ballot was received by the board of elections by Friday before election day. Id. at 362-63. Plaintiffs claimed the cutoff was too early. But the court stated that the notice and cure process only required a voter who wanted notice of a defect on their absentee ballot envelope to submit their ballot early and correct any defect by the Friday after election day. Id. (citing Va. Code Ann. § 24.2 709.1(C).) Thus, "[a]ll a voter must do to comply with the process is act in a timely fashion." Id. at 363. The court found the plaintiffs' contention in tension with longstanding Supreme Court precedent that rejected the idea that a voter's failure to follow a regulation could be said to disenfranchise that voter. Id. The relevant inquiry, the court concluded, was "whether following the notice and cure process was too burdensome on voters." Id. (citing Rosario, 410 U.S. at 760).

Here, as for the Sealing Requirement, "if a voter follows instructions" – namely, by placing his or her ballot in the container-return envelope and sealing it – "the[] vote will be counted." Id.; (see generally Doc. 1-1 (outlining procedures for if a voter does not seal either envelope or places their ballot

outside of the container-return envelope).) And if the voter follows the cure process – which is an available option if the outer envelope is sealed, but the container-return envelope appears to have been opened and re-sealed – the vote will be counted. (Doc. 1-1 at 13.)

As for the Signature Verification Requirement, Plaintiffs appear to agree that the act of signing the ballot itself is not a serious burden. Nor would the court conclude otherwise. See Hobbs, 18 F.4th at 1188 (noting that Arizona's signature requirement "imposes only a small burden on the voter"). Rather, Plaintiffs contend that the rules relating to review of the signature will impose a "serious burden on voting rights." (Doc. 6 at 19.) If it is determined by "clear evidence" that the signature on the container-return envelope is not the name of the voter, that is a non-curable deficiency. (Doc. 1-1 at 9, 15.) But this is not a case where the Challenged Provisions "totally den[y] the electoral franchise to a particular class of residents, and there [is] no way in which the members of that class could [make] themselves eligible to vote." Rosario, 410 U.S. at 758. In both cases, the 2026 Numbered Memo provides a notice and cure process. In the case of a non-curable deficiency identified by the Friday before election day, the 2026 Numbered Memo directs staff to "reissue the absentee ballot package to the voter," tell the voter what the deficiency was, and explain what the voter must do to have their vote counted.

(Doc. 1-1 at 11-12.) Even if there is not time to re-issue the ballot package, election staff will "contact the voter," who may still "vote in-person during the [17 days of the] early voting period or on Election Day, if there is still time to do so." (Id. at 12-13.) The same process applies to an irregularity that requires spoil and reissue of the absentee ballot. (Id. at 15.) In each case of a non-curable deficiency, the voter still has many options to cast a vote.

As the Ninth Circuit has observed, "[m]ost forms of voter negligence have no remedy. For example, a voter who accidentally votes for a candidate other than the voter's preferred candidate or who forgets to show up at the polls on election day cannot correct those mistakes." Hobbs, 18 F.4th at 1188. Here, like the challenged cure process which the Ninth Circuit upheld in Hobbs, North Carolina election "officials immediately notify the voter of his or her error and offer ways to correct the error" if there is an issue with the absentee ballot. Id.; (see Doc. 1-1 at 11-12.)

Although Plaintiffs express concern about the possibility that "an official, applying arbitrary standards, may refuse to verify their signatures" (Doc. 6 at 19), Plaintiffs have offered no alternative standard to ensure that the signature is in fact in the voter's name. Requiring a signature "imposes only a small burden on the voter." Hobbs, 18 F.4th at 1188. If boards of elections were not allowed to review that signature at all, as Plaintiffs

suggest, then boards of elections would have to accept a signature of a name clearly belonging to someone else, which prevents the State Board from implementing the statutory requirement that the ballot was "signed by the voter personally." N.C. Gen. Stat. § 163-230.1(d). Further, Plaintiffs have submitted no evidence that the Signature Verification Requirement is "invidiously" discriminatory. Crawford, 553 U.S. at 189 (Stevens, J.), which would justify the application of strict scrutiny.

To the extent Plaintiffs argue that "voters will not have time to return a replacement [absentee ballot] by the deadline" if the deficiency is uncovered too late (Doc. 6 at 6), that argument is unavailing. The Ninth Circuit rejected a similar argument in Hobbs, observing that "[i]f the burden imposed by a challenged law were measured by the consequence of noncompliance, then every voting prerequisite would impose the same burden and therefore would be subject to the same degree of scrutiny." 18 F.4th at 1188 (quoting Ariz. Democratic Party v. Hobbs, 485 F. Supp. 3d 1073, 1077-1078 (D. Ariz. 2020)); accord Democracy N.C. v. De Luca, No. 1:23-CV-878, 2026 WL 836812, at *27-29 (M.D.N.C. Mar. 26, 2026) (rejecting argument that law which allegedly "create[d] significant risk that eligible, bona fide voters who follow all applicable rules and affirmatively prove their address when registering will nonetheless be disenfranchised through no fault of their own" imposed a severe burden). Rather, "[t]he relevant burden for constitutional

purposes" in Hobbs was "the small burden of signing the affidavit or, if the voter fails to sign, of correcting the missing signature by election day." 18 F.4th at 1189.

Other cases lead to the same conclusion. In Rosario, the Supreme Court considered a New York election law requiring voters to enroll as a party member to vote in primaries 30 days before the general election. 410 U.S. at 753. The plaintiffs argued that "New York disenfranchised them by refusing to permit them to vote in the June 1972 primary election on the ground that they had not enrolled in a political party at least 30 days prior to the preceding general election." Id. at 756. The Supreme Court rejected this argument, noting that "it is clear that [the plaintiffs] could have" registered 30 days before the general election, "but chose not to." Id. at 758. Accordingly, "if their plight can be characterized as disenfranchisement at all, it was not caused by [New York law], but by their own failure to take timely steps to effect their enrollment." Id.

In Brink, Virginia law provided that "[i]f a voter submits their absentee ballot after the Friday before election day, the registrar could, but is not required to, give the voter an opportunity to correct defects on their ballot envelopes." 599 F. Supp. 3d at 362 (emphasis added). If a defect was discovered by the Friday before election day, the voter would be notified of the defect. Id. The court framed the burden as follows: voters

"must fill out all material information on their ballot envelope correctly, and they will only receive a chance to cure defects on their ballot envelope if they submit it by the Friday before election day." Id. The court concluded that Virginia's notice and cure process placed only a minimal burden on voters. Id. at 363. The court observed that "[a]ll a voter must do to comply with the process is to act in a timely fashion." Id.

Here, the 2026 Numbered Memo is arguably more generous than the Viriginia law at issue in Brink. If an uncurable deficiency is identified on or after the Saturday before election day, election staff "shall, on the same day the deficiency is identified, contact the voter." (Doc. 1-1 at 12 (first emphasis added).) If the voter acts early enough, he or she will have time to re-submit an absentee ballot, even in the event of an uncurable deficiency. (See id. at 11-12.) Accordingly, "[a]ll a voter must do to comply with the process is to act in a timely fashion," Brink, 599 F. Supp. 3d at 363, and any failure to vote is caused by voter's "own failure to take timely steps to effect their" vote, Rosario, 410 U.S. at 758. Absentee ballots are available sixty days before a statewide general election. N.C. Gen. Stat. § 163-227.10(a). Moreover, all absentee voters can monitor their ballots, as North Carolina allows absentee voters to track their ballots on an absentee ballot portal, so that the voter can know quickly whether their ballot faced any deficiencies. (Doc. 55-2 at 7.)

Reasonable election regulations "require [voters] to act in a timely fashion if they wish to express their views in the voting booth." Burdick, 504 U.S. at 438. The in-person voter "who accidently votes for a candidate other than the voter's preferred candidate or who forgets to show up at the polls on election day cannot correct those mistakes." Hobbs, 18 F.4th at 1188. However, the absentee voter who fails to seal his or her ballot correctly has an opportunity to correct a mistake, and is not barred from participating in early voting or voting on election day. Likewise, the voter whose signature is rejected for "clear evidence" that it is not their name has an opportunity to submit another ballot, participate in early voting, or vote on election day.[16] "It would seem odd for the U.S. Constitution to require additional leeway for absentee voting regulations when it does not require such leeway for in-person voting." Brink, 599 F. Supp. 3d at 363.

Accordingly, the court concludes that the burden imposed by the Challenged Provisions is likely modest. The court now turns to the state's interest in the Challenged Provisions.

The State Board has offered the following interests for the Sealing Requirement. First, "the sealing directive enforces a statutory requirement" which, as already discussed, is not challenged in this case. (Doc. 55 at 22; see also N.C. Gen. Stat.

[16] As noted, the 2026 Numbered Memo permits cure if the voter's signature is the same as an assistant's signature. (Doc. 1-1 at 10.)

§ 160-230.1(d) (absentee ballots "shall be . . . sealed in the container-return envelope").) Second, it "addresses chain-of-custody concerns, including uncertainty about whether a ballot remained sealed after leaving the voter." (Doc. 55 at 22.) Finally, Intervenors asserted at the hearing that the Sealing Requirement helps to prevent fraud and protect voter privacy.

For the Signature Verification Requirement, the State Board offers the following interests. First, it contends that the "signature directive helps confirm that the voter, rather than some other person, signed the [a]pplication." (Doc. 55 at 22.) Second, it carries out North Carolina law, which requires that "[t]he application shall be completed and signed by the voter personally." N.C. Gen. Stat. § 163-230.1(d).

As stated above, "[i]n cases where strict scrutiny does not apply, [courts] ask only that the state 'articulate' its asserted interests." Alcorn, 826 F.3d at 719 (quoting Wood, 207 F.3d at 717). "This is not a high bar." Id. North Carolina "indisputably has a compelling interest in preserving the integrity of its election process." Eu v. S.F. Cnty. Democratic Cent. Comm., 489 U.S. 214, 231 (1989) (citing Rosario, 410 U.S. at 761). Likewise, North Carolina has an interest in ensuring that voters follow its statutory mandate that absentee ballots "shall be . . . sealed in the container-return envelope" and "signed by the voter personally." N.C. Gen. Stat. § 163-230.1(d); cf. Berger v. N.C.

State Conf. of the NAACP, 597 U.S. 179, 191 (2022) (observing in another context that "States possess a legitimate interest in the continued enforcement of their own statutes" (cleaned up)).

It should appear evident why a state may require a voter to certify his or her ballot and status as an eligible voter. Plaintiffs' contention that the witness requirement and photo ID requirement suffices ignores not only the statutory command but the fact that those serve different purposes. The witnesses "certify that the voter is the registered voter submitting the ballots," N.C. Gen. Stat. § 163-231(a)(6), while the voter's signature attests that the voter, inter alia, is 18 years of age, has not been convicted of a felony or has completed his sentence, and understands that it is a felony to vote more than once in an election, (Doc. 55-2 at 70.) Those are facts witnesses are unlikely to know. Moreover, election integrity and chain-of-custody concerns with absentee ballots, which have been recognized to be susceptible to fraud and tampering, support the state's interest. See, e.g., Paxton, 148 F.4th at 337-338 (acknowledging that mail-in ballots are not secure and crediting district court finding that "fraud is a significant threat"); Comm'n on Fed. Election Reform, Building Confidence in U.S. Elections 46 (2005) ("Absentee ballots remain the largest source of potential voter fraud . . . [because] [a]bsentee balloting is vulnerable to abuse in several ways . . . ."). Accordingly, the court concludes that the State

Board has "'articulate[d]' its asserted interests.'" Alcorn, 826 F.3d at 719 (quoting Wood, 207 F.3d at 717).

Finally, Plaintiffs argue that if the court does not preliminarily enjoin the Challenged Provisions, it should nevertheless require county boards of elections to provide voters a right to cure. Such an order would be a mandatory preliminary injunction. Mandatory preliminary injunctions are "disfavored" in "any circumstance." Taylor, 34 F.3d at 270 n.2. They are warranted "only in the most extraordinary circumstances." Id.; accord Pierce, 97 F.4th at 209. "[A] mandatory preliminary injunction must be necessary both to protect against irreparable harm in a deteriorating circumstance created by the defendant and to preserve the court's ability to enter ultimate relief on the merits of the same kind." In re Microsoft Corp. Antitrust Litig., 333 F.3d 517, 526 (4th Cir. 2003).

Here, for the reasons explained above, voters have ample opportunity to re-cast a ballot if a non-curable deficiency is identified. Further, the Signature Verification Requirement is not new, having been in place for at least two years.[17] Accordingly, Plaintiffs have not demonstrated the "most extraordinary

[17] Though Plaintiffs do not note it, the 2026 Numbered Memo permits cure "[i]f the voter's signature is the same signature as an assistant's signature on the application." (Doc. 1-1 at 10.) This was not a cure offered in the 2024 Numbered Memo.

circumstances" that would warrant a mandatory preliminary injunction. Taylor, 34 F.3d at 270 n.2.

Therefore, based on the current record, the court concludes that Plaintiffs have not made a "clear showing" that they are likely to succeed on the merits of their Due Process and Anderson-Burdick undue burden claims.

## III. CONCLUSION

For the reasons set forth above, the court finds that Plaintiffs' motion for preliminary injunction should be denied.

The Supreme Court has repeatedly admonished lower courts that they "should ordinarily not alter the election rules on the eve of an election." Republican Nat'l Comm., 589 U.S. at 424. Here, "[t]he election is not merely upcoming; it has already started." People Not Politicians, 2026 WL 2883222, at *2. "Absentee voting has already begun." Id. Indeed, early voting is underway. Accordingly, "[t]he Purcell principle applies with even greater force here." Id.

Plaintiffs have also delayed. They waited eighteen days after the 2026 Numbered Memo was issued to bring this action, and they did not file their motion for preliminary injunction until the day before the counting of absentee ballots would begin.

Apart from these deficiencies, Plaintiffs have not made the "clear showing" the law requires that they are likely to succeed

on the merits.[18] Plaintiffs challenge the State Board's execution of statutory mandates without disputing the validity of the underlying statutes. Neither of the two Challenged Provisions, which are clearly stated on the absentee ballot materials – that the voter sign his or her own name and place their ballot in a sealed envelope provided by the county board of election - is burdensome, much less unduly so. Instead, Plaintiffs would require county boards of elections to accept signatures on the ballot application (which was issued to a specific, qualified voter) attesting to continued eligibility to cast the ballot even where the county board of elections finds "clear evidence" that it is not the name of the voter to whom the ballot was issued, thus contravening the State's statutory interest as well of those of all other qualified voters. Moreover, Plaintiffs have not clearly shown an undue burden from the Challenged Provisions. Where an absentee voter contravenes the Signature Verification Requirement or the Sealing Requirement, the 2026 Numbered Memo provides a form of notice and cure. Voters are promptly notified of a deficiency and either provided another absentee ballot to submit properly, or may elect to vote in early voting or on election day.

IT IS THEREFORE ORDERED THAT Plaintiffs' motion for preliminary injunction (Doc. 5) is DENIED.

[18] This is a preliminary determination that is not an ultimate determination of the merits.

/s/ Thomas D. Schroeder
United States District Judge

October 19, 2026